[S. F. No. 15857.  In Bank.—November 5, 1896.]

IRA P. RANKIN, ADMINISTRATOR, ETC., APPELLANT, v.
WILLIAM J. NEWMAN ET AL., RESPONDENTS.

114  635
131  164
114  635
sl48 172
sl48 174
148  175
sl48 179

PARTNERSHIP — CONSTRUCTION OF ARTICLES — PURCHASE OF DECEASED
PARTNER'S INTEREST—GOODWILL—USE OF FIRM NAME BY SURVIVING
PARTNERS.—Articles of partnership, which provide for the taking of
an inventory upon the death of one of the partners, and for an investi-
gation by a person representing the interests of the estate of the de-
ceased partner, with privilege to continue at the place of business until
all matters relating to the interests of the deceased partner have been
fairly and satisfactorily arranged, settled, and adjusted, and that the
total amount ascertained and determined to be due to the estate of the
deceased partner on account of his interest in the partnership shall be
paid by the surviving partners in specified installments, for which notes
were to be given to his heirs or legal representatives, and that the sur-
viving partners and their successors shall also have the right and privi-
lege of continuing the business under the firm name, contemplate a
purchase of the deceased partner's interest by the surviving partners,
and, upon the acquirement by them of the interest of the deceased
partner in the assets as shown by the inventory, the goodwill of the
business passes to the surviving partners under the articles conferring
the right to continue the business under the firm name.

ID.—ACTION BY REPRESENTATIVES OF DECEASED PARTNER—ACCOUNTING—
FRAUD—SUPPORT OF FINDINGS.—Where an action was brought by the
administrator of the deceased partner with the will annexed, for an
accounting of the partnership, charging fraud on the part of the surviv-
ing partners in procuring the execution of the articles of partnership by
the deceased partner, and also in procuring a settlement with the
executor of the will of the deceased partner and his attorney, without
any allowance to the estate for the goodwill of the business, findings
of the trial court against the existence of any fraud will be sustained
upon appeal where there is no evidence sufficient to establish fraud,
and the only question is one of law as to the construction of the con-
tract.

ID.—QUESTIONS UNDECIDED — EFFECT OF PARTNERSHIP ARTICLES AS TO
PRICE—POWER OF EXECUTORS—ESTOPPEL OF LEGATEES.—The justices
of the court are equally divided in opinion as to the effect of the part-
nership articles involved in the case, as respects the fixing of the price
for the purchase of the interest of the deceased partner, and as to
whether they provide effectively for the transfer of the interest of the
deceased partner, and as to whether the executor had power to settle
with the surviving partners respecting such transfer, but the justices
disagreeing to such effectiveness of the articles, and to such power of
the executor, concur in affirmance of the judgment upon the ground
that the transaction having been fair and without fraud, and the lega-
tees of the estate of the deceased partner having demanded and received
the proceeds of the sale with knowledge of the claims of the surviving

partners, and not having rescinded the sale and restored the purchase
money received therefrom, they and their representatives are estopped
to question its validity or to question that the goodwill passed under
the contract to the surviving partners.

APPEAL from an order of the Superior Court of the
City and County of San Francisco. WILLIAM T. WAL-
LACE, Judge.

The facts are stated in the opinion of the court.

*Horace W. Philbrook,* for Appellant.

The goodwill of a business is property, transferable
as any other. (Civ. Code, secs. 655, 993, 1776; *Binin-
ger* v. *Clark,* 10 Abb.·Pr., N. S., 269; *Williams* v. *Wilson,*
4 Sand. 380; *Glen etc. Mfg. Co.* v. *Hall,* 61 N. Y. 230; 19
Am. Rep. 278.) The goodwill comprises every ad-
vantage acquired in carrying on the business. (*Glen
etc. Mfg. Co.* v. *Hall, supra; Myers* v. *Kalamazoo Buggy
Co.,* 54 Mich. 215; 52 Am. Rep. 811; 1 Lindley on Part-
nership, *440; Story on Partnership, sec. 99; *Churton*
v. *Douglas,* John. 188, 189.) By the Civil Code it is
defined as the "expectation of public patronage, but
it does not include the right to use the name of any
person from whom it was acquired." (Civ. Code, sec.
992.) The name of a firm is a very important part of
the goodwill of the business carried on by the firm.
(*Churton* v. *Douglas, supra; Levy* v. *Walker,* L. R. 10 Ch.
Div. 448; *Fenn* v. *Bowles,* 7 Abb. Pr. 202; *Adams* v.
*Adams,* 7 Abb. N. C. 292; *Burckhardt* v. *Burckhardt,* 42
Ohio St. 474; 51 Am. Rep. 842; *Banks* v. *Gibson,* 34
Beav. 566; *Chappel* v. *Griffith,* 53 L. T., N. S., 459;
*Cooper* v. *Metropolitan Board of Works,* L. R. 25 Ch. Div.
479; *Hegeman* v. *Hegeman,* 8 Daly, 1.) The goodwill
does not survive to a continuing partner. (*Howe* v.
*Searing,* 10 Abb. Pr. 269; 2 Bates on Partnership, sec.
658; 2 Lindley on Partnership, *443.) The partner-
ship articles were fraudulently obtained by defendants
from the deceased, when he was weak and incompetent
to execute them, and should be held void on that

ground. (Pomeroy's Equity Jurisprudence, sec. 947; Story's Equity Jurisprudence, secs. 238, 239; *Buffalow* v. *Buffalow*, 2 Dev. & B. Eq. 241; *Dickson* v. *Kempinsky*, 96 Mo. 252; *Wilson* v. *Oldham*, 12 B. Mon. 60.) His competency to make a will does not prove his competency to contract for the purchase or sale of property. (*Harrison* v. *Rowan*, 3 Wash. C. C. 586; 1 Redfield on Wills, 128; *Converse* v. *Converse*, 21 Vt. 168; 52 Am. Dec. 58.) In order to entitle the surviving partners to take the share of the deceased at a valuation, the price must be fixed with precision in the articles. (*Blake* v. *Barnes*, 26 Abb. N. C. 208; *Harbster's Appeal*, 125 Pa. St. 3; *Maddock* v. *Astbury*, 32 N. J. Eq. 181; *Gault* v. *Reed*, 24 Tex. 54; 76 Am. Dec. 94; *Holmes' Appeal*, 79 Pa. St. 279; *Eldred* v. *Warner*, 1 Ariz. 178; Fry on Specific Performance, sec. 335; *Meux* v. *Hogue*, 91 Cal. 442–48; *Rovegno* v. *Deffarari*, 40 Cal. 462; *Pray* v. *Clark*, 113 Mass. 283; *Elmore* v. *Kingscote*, 5 Barn. & C. 583.) The executor had no power to sell or to agree upon a price without an order of the court. (Code Civ. Proc., secs. 1517, 1524, 1585; *Hill* v. *Den*, 54 Cal. 22; *Pryor* v. *Donner*, 50 Cal. 409; 19 Am. Rep. 656.) The surviving partners are trustees, and cannot sell the property of the firm to themselves, or gain any exclusive benefits therefrom. (Parsons on Partnership, sec. 345; *Case* v. *Abeel*, 1 Paige, 398; *Ogden* v. *Astor*, 4 Sand. 311–34; *Nelson* v. *Hayner*, 66 Ill. 487; *Smith* v. *Everett*, 27 Beav. 446; Civ. Code, secs. 2410, 2411.) An executor or administrator acts as a trustee for the heirs, and his attorney stands in the same confidential relation. (*Bergin* v. *Haight*, 99 Cal. 52.) The executor and his attorney could not collusively bargain away the rights of the heirs to the surviving partners, and the transaction should be set aside. (Lindley on Partnership, *488; *Cook* v. *Collinjudge*, Jacob, 607; *Nelson* v. *Hayner*, *supra;* *Ogden* v. *Astor*, *supra;* *Comstock* v. *Buchanan*, 57 Barb. 127; *Jones* v. *Dexter*, 130 Mass. 380.) The transaction being void in equity, the proper remedy is an accounting. (*Cook* v. *Collinjudge*, *supra.*) The

surviving partners must account as involuntary trustees, and are not entitled to compensation. (Civ. Code, secs. 2224, 2275; Lindley on Partnership, *528; *Burden* v. *Burden*, 1 Ves. & B. 170; *Brown's Appeal*, 89 Pa. St. 144; *Estate of Taft*, 8 N. Y. Supp. 282.)

*Edward R. Taylor*, and *Reinstein & Eisner*, for Respondents.

There is no evidence in support of the charges of fraud. The articles having provided for continuing the business in the firm name, by the survivors, they are entitled to the goodwill of the business. (*Merry* v. *Hoopes*, 111 N. Y. 415–20; *Sohier* v. *Johnson*, 111 Mass. 238–42; *Hall* v. *Hall*, 20 Beav. 139.) Surviving partners are at liberty to use the old firm name. (*Staats* v. *Howlett*, 4 Denio, 566; *Lewis* v. *Langdon*, 7 Sim. 421–25; Story on Partnership, sec. 100.) The lease of the place of business being from month to month, the goodwill is of no value. (*Chittenden* v. *Whitbeck*, 50 Mich. 401; *Thackray's Appeal*, 75 Pa. St. 132; *Rawson* v. *Pratt*, 91 Ind. 9.) The goodwill of a retail shop depends upon the place. (*Ex parte Punnett*, L. R. 16 Ch. Div. 233; *Blake* v. *Shaw*, John. 732; *Cruttwell* v. *Lye*, 17 Ves. Jr. 346.) Under the articles the surviving partners became the owners of the interest of the deceased partner when the amount due was ascertained and determined. (*Gaut* v. *Reed*, 24 Tex. 54; 76 Am. Dec. 94; Story on Partnership, sec. 358; *Holmes' Appeal*, 79 Pa. St. 279; *Eldred* v. *Warner*, 1 Ariz. 175; *Sage* v. *Woodin*, 66 N. Y. 578.) The executor acted with power conferred by the articles. (Bates on Partnership, sec. 743.) A settlement between an executor and surviving partners is *prima facie* valid unless impeached for fraud. (Lindley on Partnership, *614; *Moulton* v. *Holmes*, 57 Cal. 337; *Holmes' Appeal, supra; Chambers* v. *Howell*, 11 Beav. 6; *Kimball* v. *Lincoln*, 99 Ill. 578; *Sage* v. *Woodin, supra; Hoyt* v. *Sprague*, 103 U. S. 613.) The receipt and retention of the money by the legatees estops

them and their representatives from attacking the sale. (*Goodman* v. *Winter*, 64 Ala. 410, 433, 434; 38 Am. Rep. 13; *Schenck* v. *Sautter*, 73 Mo. 46; *Hoffmire* v. *Holcomb*, 17 Kan. 378; *France* v. *Haynes*, 67 Iowa, 139; *Moore* v. *Hill*, 85 N. C. 218; *Holmes' Appeal, supra; Escolle* v. *Franks*, 67 Cal. 137; *Karns* v. *Olney*, 80 Cal. 90–100; 13 Am. St. Rep. 101; *Hoyt* v. *Sprague, supra.*)

GAROUTTE, J.—William J. Newman, Benjamin Newman, and the deceased, John Levinson, were partners in the merchandise business, and held interests therein in proportion to the amount of capital invested by each. The last articles of copartnership between these parties were entered into January 24, 1889, and, among other things, they provided in detail the manner in which an inventory and appraisement of the partnership business should be taken annually, which inventory and appraisement should form the basis in estimating the net profit going to each partner.

The articles further provided as follows:

"In the event of the death of one of the copartners, the inventory provided for herein shall be taken as expeditiously as possible, and without unnecessary delay; the surviving partners, if requested so to do, shall admit to the place of business of the firm at least one person selected, designated, and empowered by the heirs or legal representatives of the deceased partner to represent the interest of his estate in the copartnership. Such person so representing the interests of the estate of the deceased partner shall have accorded to him access to all the books, papers, and accounts of the firm, and may at his election remain and continue at the place of business thereof until all matters relating to the interests of the deceased partner shall have been fairly and satisfactorily arranged and settled and adjusted, and the total amount due to the estate of the deceased partner shall have been ascertained and determined.

"The total amount ascertained and determined to be due the estate of the deceased partner on account of his

interest in the copartnership shall be paid to the heirs or legal representatives of the deceased partner in twelve successive and equal monthly installments, commencing within one month from the time the amount due has been ascertained and determined; for the amount of which installments the surviving partners shall execute and deliver to such heirs or legal representatives their promissory notes, payable as aforesaid, without interest, and satisfactorily secured by indorsement or otherwise; provided, however, that the surviving partners shall have the option to continue the said copartnership; the estate of the deceased partner taking the place of the decedent on such terms and conditions as may be agreed upon between the surviving partners and the legal representatives of the deceased partner, but it shall not be obligatory upon the surviving partners so to do. The surviving partners and their successors shall also have the right and privilege of continuing the business under the said designation and name of Newman & Levinson."

Levinson died February 25, 1890, and forthwith the Newmans made an inventory and appraisement of the partnership business, as provided by the articles of partnership, by which inventory and appraisement it was determined that the net amount of Levinson's interest in the assets of the firm was the sum of twenty thousand seven hundred and ninety dollars and eighty-eight cents. For this amount defendants prepared and procured to be properly indorsed their notes, twelve in number, for the sum of seventeen hundred and thirty-two dollars and fifty-seven and one-third cents, each bearing date February 26, 1890, payable at successive monthly intervals following that date, and within one month after Levinson's death tendered them to Raveley, the executor of the will of said deceased, who had then received letters testamentary from the superior court. In July, 1890, the Newmans filed a petition in the court alleging that they were ready and willing to purchase the interest of the deceased in the

partnership upon the terms stated in the articles, and
had requested the executor to allow them to do so; that
he had refused, and praying an order directing him to
convey that interest to them.  The court sustained a
demurrer to such petition, on the ground that it had no
jurisdiction to grant the order prayed for.  Thereafter,
on September 6, 1890, Raveley, the executor, being of
the opinion that he had the power to accept the terms
proposed by the Newmans, received the said notes, and
on that day executed to them two certain papers, the
first of which acknowledged the delivery of the notes
"in pursuance of the provisions of the articles of part-
nership . . . . for the interest of the estate of said Lev-
inson in said partnership."  The other paper set out
the transaction more in detail, and stated that the
amount of such notes was the amount of Levinson's
interest in the assets of the firm, as determined by the
said inventory and appraisement, and that the notes
were received by the executor "in full payment and
satisfaction of the amount due the estate of John Levin-
son, deceased, for the interest of said deceased and of
his said estate in the copartnership firm as the same
has been ascertained, as above stated."

Levinson's residuary legatees were his mother and
two sisters, all of full age.  They in writing notified
the Newmans on March 5, 1890, that they did not de-
sire to employ any person to assist in taking the inven-
tory of the assets of the late firm, then in progress, and
the estate of the deceased had no representative in that
undertaking, though the executor was often about the
place of business, and both he and the legatees knew
what was being done.  No account of the goodwill of
the firm was taken in the inventory made by the de-
fendants, nor was it in the inventory and appraisement
of the estate returned to the court by the executor.  In
the inventory and appraisement returned by the execu-
tor the value of the interest of Levinson in the partner-
ship assets was stated at the same sum as that fixed by
the appraisement of the defendants, to wit, twenty

thousand seven hundred and ninety dollars and eighty-eight cents, and was adopted by the appraisers on the strength of that appraisement. The omission to value the goodwill as part of the estate by the executor was resented by the legatees, and on this ground they petitioned the court to remove Raveley from his office of executor. He thereupon resigned, his accounts were settled, successive administrators with the will annexed carried on the administration, until finally H. W. Philbrook was appointed, and he has been substituted as plaintiff of record herein. This action is essentially one in equity sounding largely in fraud, and asking for an accounting of the partnership affairs. The case has been before us in the past upon an appeal from the judgment (*Rankin* v. *Newman*, 107 Cal. 602), where may be found an outline of the purposes of the action and the general framework of the pleadings.

Fraud is charged in the body of plaintiff's bill, and upon that ground relief in a great measure is sought. But in the opinion of the trial judge, Hon. W. T. Wallace, which opinion is set forth in the record, it is stated that there is no evidence whatever to support such a charge. And, after a careful examination of the evidence, we find nothing therein even tending to show the practice of any fraud upon the heirs and legatees of the dead partner. It follows that all question of fraud is out of the case, and the only important question remaining is, Had the executor under the articles of copartnership the right to consummate the transfer of the deceased partner's interest in the business to the surviving partners for the consideration specified in said articles? Although this interrogatory presents a clearcut proposition of law, still it is well to say that, if this transfer of the partnership interest should be set aside, as is here sought by appellant, and all parties be placed *in statu quo*, as of the day the transaction was had, no substantial results favorable to appellant's interests would ensue. It would be a valueless victory, for, as said by the trial judge, upon an accounting the

sum realized by the legatees would fall far short of the amount actually paid by the surviving partners to them.

In appellant's brief the law is conceded to be: " Where the copartners in the partnership contract— articles of partnership—do actually contract that on the death of a partner the partnership property and business belongs to the survivor or survivors, fixing the price at which it is to be taken by the survivor or survivors, such contract is binding according to its terms." Upon such concession we are brought face to face with the articles of copartnership for the purpose of weighing and testing them by the formula furnished by appellant; and at the threshold of the investigation we are met by the objection that, at the date when those articles were entered into, the deceased partner, Levinson, was incapable, by reason of mental incapacity, of entering into any contract whatever. The mental incapacity of Levinson at the time was not even suggested in plaintiff's bill, and his mental *status* does not appear to be an element of the case that attracted serious attention at the trial. But some evidence came before the court upon the question without objection, which, even in the absence of direct issues raised by the pleadings, should be considered as bearing upon the question. ( *Crowley* v. *City R. R. Co.*, 60 Cal. 628.) There are various good reasons why this evidence should not be held sufficient to invalidate the articles of copartnership, and as an all-sufficient reason we suggest that the implied finding of the court was against any such contention. Appellant's principal witness to the point testified that if Levinson had read the articles of copartnership he would have understood them, and there is no evidence in the record that he did not read them. As a salient circumstance bearing upon Levinson's mental capacity at that particular time, it may be noticed that some few days thereafter he executed his last will and testament, the will under which this administrator is now acting in prosecuting this litigation. It further appears that⸱

upon his return from Europe after the execution of
these articles, for several months and up to the time of
his death, he gave his personal attention to the business
of the firm as he had always done in the past.   We are
satisfied there is nothing in the point.

We have quoted in detail that portion of the partner-
ship contract which declares what shall be done with
the business in case of the death of one of the partners.
In this respect the provision of the contract is not well
drawn.   It is not clear, but, upon the contrary, some-
what vague and indefinite.   At the same time, when
carefully read and considered, but one conclusion can be
arrived at; and that is that, upon the death of one of
the partners, the surviving members of the firm had at
least the privilege and option of buying the interest of
the deceased partner in the business upon certain terms.
It is claimed upon the part of the Newmans that under
the contract they were bound to do so.   But to support
the validity of the contract in this regard they are not
compelled to go to such length; for, if they had an
option by the articles of copartnership to purchase upon
stated terms, then they had the undoubted right to ex-
ercise that option and take the interest of the deceased
partner, if they were so disposed.   (*Harbster's Appeal,*
125 Pa. St. 3.)   In that case it is said: "It requires no
argument to show that the interest of the deceased part-
ner ended when the firm gave notice that they would
take it in accordance with the terms of the agreement."
And in the case at bar, if the Newmans simply held an
option to purchase the interest, there can be no ques-
tion but that they exercised that option in favor of pur-
chasing.   If it should be held that the copartnership
articles did not give the surviving partners a right to
purchase, then the presence of all that portion of the
contract providing for the mode and manner of pay-
ment by the Newmans for the deceased partner's inter-
est would be inexplicable.   It is provided in great detail
that they should give their equal monthly installment
notes, running over a period of twelve months, in pay-

ment of the interest of the deceased partner. Such pro-
vision beyond question contemplated a sale, and that a
sale to the surviving partners in case of the death of
one of the firm was in the minds of all parties when
the contract was made, does not admit of doubt. There
can be no other reasonable construction of the instru-
ment.

It is insisted that the language here used provides no
fixed and definite amount of money to be paid by the
surviving partner for the interest of the deceased part-
ner, and it is claimed that for such reason there is no
contract, at least no contract sufficiently clear and ex-
plicit, to be capable of enforcement. There is no case
cited by appellant that goes to the lengths here insisted
upon. But, upon the contrary, that is certain which
may be made certain, and many of the cases bearing
upon this question rest upon this principle. Number-
less cases might be cited where courts have recognized
the right of the partners to stipulate in the copartner-
ship articles that the purchase price for the interest of a
deceased partner shall be fixed by an inventory and ap-
praisement to be taken after the death of such partner.
In the very nature of things, a fair purchase price of an
interest in the firm at an indefinite future time would
be incapable of ascertainment. To fix the amount in
advance would be simply a speculative gamble upon the
part of all parties concerned, and hardly justifiable
either in morals or law.

It is further contended that there is no mode what-
ever provided in the articles by which to ascertain the
value of the interest of the deceased partner; and it
may well be conceded that the provisions of the con-
tract in this regard are not what they should be. In
this particular the instrument is unhappily drawn, and
well serves the purpose of being an invitation for liti-
gation. As we have already seen, the articles provide
for an annual inventory and appraisement in order that
the actual financial *status* of the concern may be
determined. This inventory and appraisement was pro-

vided for in order that the annual profit or loss of each partner might be known. A succeeding subdivision of the contract, which we have heretofore quoted in full, then in part declares: "In the event of the death of one of the copartners, the inventory provided for herein shall be taken as expeditiously as possible, and without unnecessary delay. The surviving partners, if requested so to do, shall admit to the place of business of the firm at least one person selected . . . . by the heirs or legal representatives of the deceased partner, to represent the interest of his estate in the copartnership . . . . and may at his election remain and continue at the place of business thereof until all matters relating to the interest of the deceased partner and his estate shall have been fairly and satisfactorily arranged and settled and adjusted, and the total amount due to the estate of the deceased partner shall have been so determined. The total amount ascertained and determined to be due the estate of the deceased partner, on account of his interest in the copartnership, shall be paid to the heirs or legal representatives of the deceased partner, in twelve successive and equal monthly installments." If the language of the contract had included the words "and appraisement" after the word "inventory," there would have been no question of indefiniteness, and no possible technical objection as to the matter of construction. But the absence of those two words should not nullify the contract. It would be carrying the doctrine of technicality too far, if we should so hold, The true intent of the parties is plainly apparent from the language used. And that intent was that an inventory *and appraisement*, as provided for in the articles, should furnish the basis for fixing the purchase price of the deceased partner's interest. Such is the fair construction of the language, taking it altogether, and, indeed, the only construction which can be given it. To say that the parties to the contract, while providing for a sale and also providing for the manner and time

for payment, never intended to provide as to the amount which should be paid, or to fix any mode by which the amount could be determined, would be going to lengths entirely unauthorized by the instrument itself. We hold that the mode and manner of fixing the amount of the purchase price is found within the language of the instrument itself, and that mode and manner is the inventory and appraisement provided for in a previous portion of the contract.

Conceding that the inventory and appraisement mentioned in the articles of copartnership were intended by the partners to be used as the basis for fixing the value of a deceased partner's interest, then appellant contends that the contract was void as placing it in the power of the surviving partners to fix their own purchase price. There is no force in this contention. The contract contemplates the presence of a representative of the deceased partner during all these times, and incidentally it may be suggested that the executor was present, during the time, more or less, and that both he and the legatees had full knowledge of what was being done, and ample opportunity to be present at all times and upon all occasions to assist, either personally or by agent.

Again, as to the store and office fixtures, the value is fixed at a certain and definite amount. As to the stock of merchandise on hand, it is to be appraised at its actual value, but not to exceed its original cost. All solvent debts are to be taken at their face value. We see nothing so indefinite in these facts as to nullify the contract. The actual value of a piece of merchandise can be determined; and likewise it can be determined what is and what is not a solvent account. They are matters capable of ascertainment, and every partnership in the country is constantly engaged in determining them. There is certainly nothing so indefinite and uncertain as to the valuation to be fixed upon these assets as to in any way render the contract nugatory. In *Harbster's Appeal,* cited by appellant, the purchase price

was fixed at the previous annual appraisement, with the proportion of profit or loss for the present year added or deducted, as the case might be. It certainly in that case was no easier to fix the amount of the profit or loss than it was in this case to fix the actual value of the stock, or determine what debt was a solvent account. Indeed, both of those factors of the business were necessary elements to be determined before the profit or loss could be fixed. In another of appellant's cases, *Blake* v. *Barnes*, 26 Abb. N. C. 208, the purchase price by the surviving partners upon the death of a member of the firm was to be determined by an inventory and appraisement, to be made as follows: "(b) Accounts overdue at a fair estimate, to be determined, if necessary, by arbitration; (c) Rejected machinery, or any other property or merchandise for which the firm is not willing to allow the valuation inventoried, or hereinbefore provided for, at the price offered by the highest bidder; (d) For the stereo and electrotype plates, engravings . . . . a sum equal to the gross profits of the firm for the last two complete business years preceding the time of settlement." It was not suggested that such a character of valuation avoided the contract, although the case was bitterly contested on other grounds. The case of *Simmons* v. *Leonard*, 3 Hare, 581, goes away beyond the cases just cited. It was there provided that the surviving partners should take the interest of the deceased partner at a valuation shown by the last annual accounting, the articles having provided for annual accounts. A partner died, and no annual accounts had been taken. The representative of the deceased partner, as in this case, contended that there could be no sale, as the purchase price was not fixed. The vice-chancellor said: " The rule which justice and common sense would apply in such a case is, I think, too clear for serious argument. The proviso for sale in one event, that of the term running out, and the proviso for paying off a deceased partner's share (dying during the term) by installments, is conclusive evidence of an intention and agreement

that the death of a partner during the term should not
work a dissolution of the whole partnership, but that
the survivors should have a right to carry it on, with
the accommodation of paying off the executors of a de-
ceased partner by installments." And, in conclusion,
he held the contract for a sale good, and that the pur-
chase price should be determined by an accounting.

In *Dinham* v. *Bradford*, L. R. 5 Ch. App. 519, it is held
in effect that the articles of copartnership might provide
that the purchase price of a deceased partner's interest
in the business should be fixed by three disinterested
parties. In *Quinlivan* v. *English*, 44 Mo. 46, the value
of the interest of a deceased partner was to be fixed by
an appraisement made after his death, and, in case of a
dispute as to the valuation of the stock, the matter was
to be submitted to three arbitrators. The court held
such an agreement valid and binding. Indeed, it may
be suggested that the authorities are practically unani-
mous that any question of indefiniteness or uncertainty
as to the amount of the purchase price, or the manner
or mode in which such price is to be arrived at, in no
way affects the right of the surviving partners under
the partnership contract to buy. And it is held in many
cases that such conditions only result in casting the
burden upon the trial court to take an accounting and
fix the price. We conclude that the contract is valid
and binding in all respects; that the amount of the pur-
chase price for the deceased partner's interest in the
business was fixed by the articles with such sufficient
certainty as to deny the court the right to hold a general
accounting. And, in the absence of a showing of fraud,
to some extent at least, in the making of the inventory
and appraisement which formed the basic element in
fixing the purchase price, the transaction should be up-
held.

While this litigation, judging by the size of the tran-
script and briefs before us, has now assumed somewhat
mammoth proportions, there was a time in its early his-
tory when but a single matter was involved. And that

matter arose upon the contention of the administrator that the goodwill of the business was not included in the inventory and appraisement of the property of the deceased returned by the executor to the probate court. Owing to the views we entertain as to the validity of the contract, this contention may be disposed of in a few words. The contract of partnership provided: "The surviving partners and their successors shall also have the right and privilege of continuing the said business under the said designation and name of Newman & Levinson." We have no doubt that the goodwill of the business passed to the surviving partners under this provision of the contract, and in no sense formed an asset of the estate. Much could be said upon this question showing the instability of appellant's claims in this regard, but we deem it unnecessary.

The order appealed from is affirmed.

McFARLAND, J., and VAN FLEET, J., concurred.

BEATTY, C. J., HENSHAW, J., and TEMPLE, J., concurring.—We concur in the judgment. We do not think we can say over the implied finding of the trial court that the execution of the partnership articles was procured by fraud, or by the use of undue influence. The question is argued on the assumption that the Newmans were contracting with the expectation that they would be the survivors. We do not think we can assume that. Such a consideration was proper to be urged upon the trial court under the charge of fraud, and evidence could have been addressed to that point. It does not appear that any such question was tried. It does appear that Levinson was then ill, but we do not find that the illness was deemed mortal. He lived more than one year thereafter, and during a portion of that time was able to attend to business.

But the advantages of the agreement are not all on one side. In case of a dissolution by death it would have been the privilege of the surviving partners, in case

there was no provision made for such an event, to have stopped the business and to have gone into liquidation. In such case the goods would have been sold at a sacrifice, and the estate would have realized nothing for the goodwill.

As to the construction and effect of the twelfth article of the partnership agreement between the defendants and their deceased partner, our views do not coincide with those expressed in the preceding opinion. The meaning of that article is, of course, the main question in the case, and for two years after the death of Levinson it was the only question—the attack upon the validity of the agreement based upon the alleged mental incapacity of Levinson and the charge of undue influence by his surviving partners, being an evident afterthought. So much stress, however, has been laid upon this matter in the argument, and it forms so large and so essential a part of the charge of fraud, to the elaboration of which the voluminous brief of appellants is mainly devoted, that it cannot be ignored. The fact that the validity of the partnership agreement is affirmed by the implied finding of the superior court, and that there is substantial evidence to support such finding, is sufficient, as shown in the preceding opinion, to put an end to the question, so far as it is material to the decision of this appeal, but with respect to the matters so vehemently and intemperately argued upon the part of appellant, and especially with reference to the torrent of vituperation poured out upon Mr. Justice Harrison, it is important to note that never upon any occasion during the time that he was acting as attorney for executor Raveley was there the slightest hint or suggestion to the effect that the partnership articles were in any respect invalid, or that Levinson at the time he signed them was mentally incapacitated or subjected to the slightest degree of undue influence. On the contrary, the whole dispute from the beginning, and for two years after the death of Levinson, was as to the construction of the agreement, and, in particular, whether, according to its terms, the estate

of Levinson was entitled to separate and additional compensation for his interest in the goodwill of the business of the firm. The mother and sisters of Levinson—all adults—and Mr. Philbrook, their attorney, assumed as a fact unquestioned that the contract was entirely valid, and that the rights of all parties were dependent upon its proper construction. Under these circumstances it would have been strange indeed if the attorneys for the executor had not taken the same view. Naturally and inevitably they confined their attention to the meaning of the contract, and to the steps necessary to be taken in carrying it out according to the intention of the parties. They (the firm of Jarboe & Harrison) had been employed by the executor within a few days after the death of Levinson, and Mr. Philbrook shortly afterward was employed by the mother and sisters of the decedent to look especially after their interests. From the very first there was an open difference of opinion between these attorneys as to the meaning of the partnership agreement with respect to the right of Levinson's estate to be paid an additional compensation for his interest in the goodwill of the business, over and above the appraised value of his interest in the stock of goods, fixtures, accounts, and other tangible assets of the firm. Jarboe & Harrison took the position, which they always maintained openly and unequivocally, that according to the proper construction of the agreement the surviving partners took the whole interest of the deceased partner, including the right to continue the business under the name of Newman & Levinson, upon payment of the appraised value of his share of the assets, to be ascertained by an inventory and appraisement according to the annual custom of the house, and that no separate allowance for goodwill was contemplated or provided for. Mr. Philbrook took the opposite view, which he likewise consistently maintained. There was no other difference between the parties or their legal advisers, and when the inventory and appraisement were made their fairness and cor-

rectness, so far as they went, were not disputed, the
only objection on the part of Mr. Philbrook and his
clients being that it made no allowance for the value of
the goodwill.   No charge of fraud or undervaluation of
assets, or overstatement of liabilities in the appraise-
ment, was then or ever during Judge Harrison's connec-
tion with the case made or suggested.   The dispute was
wholly upon a question of law, i. e., the construction of
a contract, and as to this there was, as above stated, no
equivocation or concealment whatever.

Mr. Philbrook, however, seems to think that Jarboe
and Harrison were guilty of a species of disloyalty to
*his* clients, because, notwithstanding their opinion to
the contrary, they did not sustain him in his position,
and advise *their* client accordingly.   But this conten-
tion is utterly unreasonable.   They were attorneys for
the executor, who was trustee not only of the legatees,
but also of the creditors of his testator, and it was their
imperative duty to advise him to proceed according to
the true construction of the agreement as they inter-
preted it, and especially to see that he wasted no portion
of the estate in fruitless litigation.   In view of the dif-
ference of opinion between them and the attorney for
the legatees, it was natural that they should take time
to consider before deciding a question so delicate and
so important, and equally natural that they should
wish to submit the decision of the matter to the probate
court.   But when that court, in the proceedings insti-
tuted by the Newmans to compel the executor to trans-
fer to them the interest of the deceased partner, declined
to give a construction to the agreement upon the ground
that it had no jurisdiction to decide upon the matter,
the responsibility was thrown upon the attorneys for the
executor to decide whether he should accept or reject
the tender which the Newmans had made of the ap-
praised value of Levinson's interest.   Being obliged to
take the responsibility of deciding, they naturally de-
cided according to their own construction of the con-
tract, and not according to Mr. Philbrook's.   Differing,

as we do, from the views which they entertained, we should never have thought of imputing a bad motive for their decision, if for no other, yet for the simple reason that, if wrong, it could harm no one but themselves and their client.   A large part of Mr. Philbrook's tirade is based upon the assumption that Jarboe & Harrison did not really entertain the opinion which they expressed, and that they only advised the executor ·to the course that he took because they were acting in collusion with, and in the interest of, the Newmans.   The absurdity of this position is manifest from the fact that any settlement between the executor and the Newmans, not made in accordance with the true construction of the contract, could only involve the parties to such settlement in loss and difficulty, and could not possibly foreclose or prejudice the rights of the residuary legatees. .

By accepting the money and notes tendered by the Newmans in full payment for the interest of his testator in the firm, the executor placed himself in the position of unequivocally refusing to proceed against the surviving partners on account of the value of the goodwill, and thereby gave to the residuary legatees the right to ask, as they ultimately did, for his discharge, upon the ground that he was neglecting the duties of his trust.   As to the executor, this was the sole effect of erroneous advice on this point.   As to the Newmans, the effect of a settlement unauthorized by the probate court, and unwarranted by the terms of the partnership agreement, would simply be to expose them to an action for an accounting—this very action—in which the most rigorous and burdensome rules for computing the interest of Levinson in the assets of the firm and profits of the business would be enforceable against them at the option of the administrator with the will annexed.   To suppose, as the argument does, that the attorneys for the executor were deliberately giving him advice which they knew to be bad, in order to serve the interest of the Newmans at the expense of the legatees, when the,

only effect of the course advised would be to expose the executor to censure and punishment, and the Newmans to certain loss, is rather too heavy a draft on human credulity.

But it is not alone the acceptance of the tender made by the surviving partners, and the advice upon which the executor acted, that furnish grounds for Mr. Philbrook's suspicions. It is the *secrecy* of the transaction, and the fact that the receipts or acknowledgments given by the executor were in the handwriting of, and were witnessed by, a gentleman who at the date of the settlement had been nominated by a leading political party of the state for a seat on this bench, that excites his deepest indignation. He can see in these circumstances nothing but a deliberate attempt to defraud his clients and to corrupt this court.

As to the secrecy of the transaction, the simple truth is that Mr. Philbrook and his clients were not called in to witness the payment of the money or the delivery of the receipts, and there was no reason why they should be present. It was not necessary that they should be there to protest in order not to be bound by the settlement. Their rights were not being concluded, or in anywise prejudiced. The fact that the notes and money were in the hands of the executor was nothing to them. The time for presentation of claims of creditors had not elapsed, the time for filing a first annual account had not arrived. No part of the money in the hands of the executor could then or for months thereafter be applied in payment of claims or legacies; in short, neither the executor nor the Newmans could gain the slightest advantage, nor the legatees suffer the slightest loss, by concealment of the fact that the settlement had been made. And accordingly we find that upon the very first occasion calling for a disclosure of the fact and the terms of the settlement, such disclosure was fully and unreservedly made in the most direct and certain terms. The settlement was made in September, and in November following, in response to a

demand for an amended inventory of Levinson's es-
tate, which should include the item of goodwill of the
business, the surviving partners served upon Mr. Phil-
brook their written answer, which contained, among
other things, the following passage:

"*And deny* that said William J. Newman, or said Ben-
jamin Newman, *has not fully accounted to said* executor of
said estate for any and all moneys, interests, and claims
due to said estate from said William J. Newman or said
Benjamin Newman, or either of them, and, *aver, on the
contrary, that they have fully accounted for any and all
claims, payments, and sums due said estate in the manner
set forth in said memorandum in writing,* and in this
behalf said William J. Newman and said Benjamin New-
man aver that after the appointment of said S. W. Rav-
eley as the executor of the last will and testament of said
John Levinson, deceased, said executor requested them—
said William J. Newman and Benjamin Newman—*to
account to him for the interest of said decedent in said co-
partnership, and said William J. Newman and said Benja-
min Newman did thereupon account to him* and exhibit to
him, said executor, all the books and assets of every
kind belonging to said copartnership, and it appeared
therefrom that the entire interest of said decedent in
the assets of said copartnership amounted to the
sum of twenty thousand seven hundred and ninety
dollars and eighty cents, and thereupon said William
J. Newman *and said Benjamin Newman elected and de-
cided, under and in accordance with the provisions of said
memorandum in writing, to purchase and pay for the in-
terest of said decedent, in said copartnership, and there-
upon executed to said S. W. Raveley, as executor aforesaid,
twelve certain promissory notes, bearing date the twenty-
sixth day of February, 1890, payable at monthly intervals
thereafter, each for the sum of seventeen hundred and thirty-
two dollars and fifty-seven and one-third cents (said prom-
issory notes aggregating the sum of twenty thousand seven
hundred and ninety dollars and eighty cents), in full pay-
ment and discharge of the interest of said decedent in said*

*copartnership business, as the same had been ascertained and determined by the inventory and appraisement thereof, made in accordance with the provisions of said memorandum in writing.*"

Mr. Philbrook knows the meaning of a plain statement in plain English, and, therefore, it is not to be doubted that from and after the nineteenth day of November, 1890, he and his clients knew that executor Raveley had accepted from the surviving partners their notes for twenty thousand seven hundred and ninety dollars and eighty cents, in full payment for his testator's interest in the copartnership. He knew then and ever afterward that Raveley, acting under the advice of his attorneys, would refuse to prosecute an action against the Newmans for a further accounting, and that the legatees, if they desired to have such an action instituted, must procure the removal of the executor, and the appointment of an administrator with the will annexed who would be guided by his advice. This is the course which was taken just one year after Mr. Philbrook was advised of the settlement, and, since he allowed a whole year to elapse after receiving the information before taking the only action that the settlement called for, he can hardly complain that the fact was not disclosed two months sooner than it was. As to the fact that Mr. Harrison, after his nomination for justice of the supreme court, continued to advise executor Raveley in a matter in which he had been employed long before his nomination, and the further fact that he drew up and witnessed the papers which passed upon the settlement, it seems scarcely credible that a normal mind could regard them as evidence of fraud, or as an attempt to corruptly influence the decision of this court. But it is out of these simple circumstances that Mr. Philbrook has constructed his elaborate theory of fraud and corruption.

The truth is there is not only no foundation for the argument upon this point, but the fact which it seeks to establish is totally irrelevant. The motives which

may have prompted Raveley's attorneys in giving their advice, the advice itself and the action taken in consequence of it have not in the slightest degree affected the rights of Levinson's mother and sisters. If the advice was correct, as held in the preceding opinion, there never was any ground of complaint. If it was incorrect the settlement did not bind the estate, and the Newmans remained accountable for the true value of Levinson's interest at the time of his death, or, at the option of his representatives, for the profits of the business which they continued to carry on.

If these views are correct, and we have no doubt that they are, the whole question of fraud and corruption so gratuitously imported into the case may be dismissed from further consideration, and attention confined to the questions upon which the decision of the appeal necessarily depends.

The agreement between the Newmans and Levinson, which by the preceding opinion is held to be a contract of sale, properly bears the construction put upon it. It was within the terms of the agreement and the contemplation of the parties that in some way a purchase by the survivors should be made. If the contract were in other respects free from objection, the case would be the not unusual one where the partners provide for the purchase by the survivors of the interest of a deceased member of the firm. Upon the exercise by the survivors of their right the sale would be complete, and the surviving partners would become debtors to the estate of the deceased partner, with the duty of accounting with his representative for the value of the deceased partner's interest.

Cases are not rare where contracts of this nature have been entered into and enforced, but, when upheld, it is because they are certain and specific in their terms, and unobjectionable upon any equitable consideration. The plan adopted by these partners for arriving at the value of their annual profits by deducting from their assets the amount of their liabilities was feasible and satisfac-

tory while all the partners were living, but upon the death of Levinson not the profits merely, but the whole of his interest was in some manner to be determined and withdrawn from the assets of the firm.  While all of the partners were alive it did not matter how the assets were valued or the liabilities estimated, for what they did not take out as profits they retained in the assets of the firm.  But, when one died, it became highly important that his share, then to be wholly withdrawn, should be fairly and fully valued.  The apportionment of profits involved no transfer of title to the remaining capital; but such a transfer was necessarily involved in the transaction contemplated upon the death of a partner.  Frequently, says Lindley on Partnership, section 429, in order to prevent the ruin consequent on the sale when a partnership happens to be dissolved by the death of a partner, it is provided that the share of the deceased may be taken by the survivors at the value shown by the last settlement agreed to by him, with the addition of any subsequent profit.  But here a new valuation was to be made, and either no method is provided in the contract for arriving at that valuation, or, if a method be found, it can only be the method actually adopted—the valuation being made by the surviving partners themselves.  But, in the first instance, if no mode is prescribed, there is the absence of an essential element of a contract of sale which equity cannot supply—the price or the manner of determining the price.  If the second, and the mode adopted be the one contemplated by the contract, then if the contract be valid it must result in holding that the surviving partners, trustees of the deceased partner's share, may not only purchase that share, but may fix the value which they will pay for it.

But, if we understand respondents, they do not contend, nor could they successfully, for the latter proposition, but they claim that by their agreement with the executor such value was legally ascertained, and herein it is claimed that the executor in effecting that settle-

ment was merely carrying into effect the contract of his testator, as expressed in the articles. But something more was necessary. The testator's contract did not determine the amount of the consideration to be rendered by the survivor for his interest, and the exercise of a further act of discretion, judgment, and assent was necessary to ascertain the amount. (*Morrison* v. *Rossignol,* 5 Cal. 64; *Breckinridge* v. *Crocker,* 78 Cal. 529; *Vickers* v. *Vickers,* L. R. 4 Eq. Cas. 529.) It is said that these were cases where specific performance was sought, while in this instance the contract has been executed. This is true, but we are now dealing with the question of power in the executor, and these cases illustrate the proposition that in making the adjustment with defendants the executor necessarily supplied the missing terms of his testator's contract by the exercise of his own will and discretion.

Had the executor that authority? Defendants claim it for him by virtue of his general powers, and independently of the articles. At the common law such power was unquestionably his, but at common law the executor or administrator held the title of the personal property of the decedent, while with us title to personalty, as well as to realty, vests in the heirs, subject only to the right of the executor to take possession of it for specific purposes. At common law, then, the representative could sell personal property without restraint, so long as his acts were not fraudulent, but here his power to sell is dependent upon the assent of the superior court. (Code Civ. Proc., secs. 1517, 1561; *Wickersham* v. *Johnson,* 104 Cal. 407; 43 Am. St. Rep. 118; 2 Wœrner's Law of Administration, sec. 331.)

The provisions of the articles for the transfer of Levinson's interest were incomplete, in that no price was fixed, and that no disinterested person was named who should fix the price. The executor, by assenting to the valuation put by the Newmans on the partnership interest, assumed to supply the omission of the contract, and to fix a sum at which they might take the interest.

It is not claimed that the executor derived authority to make the sale from the will of deceased. As the arti- cles fall short of conferring that power, he could neces- sarily derive it only from the court in the manner prescribed by statute. But under the statute it could be sold only "in the same manner as other personal property," namely, by authority and consent of the su- perior court.

Had the contract of partnership determined the price, or prescribed some legal mode of ascertaining the price, the cases cited in the preceding opinion would be di- rectly in point. Then the executor would have needed only to abide by the terms of the contract. (*Janin* v. *Browne*, 59 Cal. 37.) The wisdom or policy of the con- tract would have been none of his concern. But, under the facts, the necessity for the supervisory power of the court to order a sale, and for the caution of the statute that before confirming the sale of the partnership inter- est the court or judge must carefully inquire into the condition of the partnership affairs, and must examine the surviving partner (Code Civ. Proc., sec. 1524), was as manifest as if there had been no contract.

But it is further said that the inventory and appraise- ment were made in the manner usual during Levinson's life, and that this established a custom by which the articles are to be interpreted. But a customary mode of valuing assets, with a view of determining and with- drawing profits, is radically different from the requisites of a fair and reasonable estimate of all assets with a view to segregating the share of a deceased partner for pur- chase by the others.

We think the conclusion inevitable that the executor exceeded his authority in the settlement with defend- ants; that he did not, as is admitted, follow the statutory mode in making the settlement, and that there was no power for him to do so under the articles.

Leaving aside for the moment the question whether or not the goodwill was included in the settlement, we think the evidence overwhelmingly establishes, as the

trial court held, that the sum found by the Newmans under the inventory and appraisement to be the value of Levinson's interest, and by the Newmans paid into the estate of Levinson, and received by the executor thereof, was not only a just amount, but indeed a very liberal amount. The evidence seems to be without conflict, and at least is strongly in favor of the respondents, that the appraised value put by the Newmans upon the interest of their deceased partner was greater than its actual worth. It was paid over and received, with knowledge then or soon afterward acquired of the claim of the Newmans that by the payment they took to themselves the deceased's interest and title in the assets of the copartnership, and acquired the right to continue to conduct the business under the firm name. Thereafter the heirs, who were all of age, and who were represented throughout all court proceedings by their attorney, petitioned for, and, despite the protests of the executor, obtained a decree of partial distribution, distributing to them as of the property of the estate a portion of the moneys thus obtained from the Newmans. At the time when this decree was sought and obtained, the source from which the moneys came, and the circumstances under which it had been paid over to the estate, and the claims of the Newmans in regard thereto, were well known to them. Their opposing claim, during all of this time, seems to have been solely the one that the goodwill had not passed to the Newmans, and was still personal property, and a part of the assets of Levinson's estate.

Having, under these circumstances, demanded and received the moneys so paid by the Newmans, the price having been fair and the transaction without fraud, we are of opinion that they are estopped from questioning the settlement while retaining the benefits of it, and from denying that there passed to the Newmans whatever would have passed under the terms of the contract had it been free from the defect above discussed.

What, then, would have passed, and what are appel-

lants estopped from denying did pass? Unquestion-
ably there passed to the Newmans Levinson's interest
in the assets, as shown by the inventory and appraise-
ment upon which the settlement was based. But the
articles provide further that the survivors shall have the
right to continue the business under the firm name of
Newman & Levinson. This clause may be construed
either as dependent or independent of the covenant to
purchase. If construed as dependent, then the contract
was that upon purchasing under the inventory and
appraisement the survivors would acquire the right to
continue the business under the firm name. In this
view appellants would also be estopped from denying
that there passed to defendants the right to conduct the
business under the firm name. If, however, this clause
is to be construed as independent, it is of itself valid
and operative, and conferred this right upon defendants
regardless of other considerations. In either case it
must follow that the right to conduct the business under
the firm name passed to the defendants.

There thus comes under consideration the question
which originally, and for a long time, was the sole point
of difference between the parties, the question of the
disposition of the goodwill; for it appears that, while
the heirs from a very early date insisted that the good-
will still remained a part of the property of the estate,
and should be inventoried and appraised as such, they
made no objection to the valuation put upon the de-
ceased partner's interest, nor to the sale of that interest,
saving that therein the goodwill had not been valued.
There was no concealment nor secrecy nor fraud in this.
The heirs were informed that the goodwill was not in-
cluded, the contention of the executor and of the
Newmans under the advice of counsel being that the
goodwill, under the circumstances, did not become a
part of the assets of the estate, but vested in the surviv-
ing partners.

While some of the earlier cases lean to the doctrine
that, upon the death of one partner, the goodwill goes

to the survivors, the great weight of later decision is to the contrary. Thus, it is said by Bates on Partnership, volume 2, section 658: "It was once thought that upon the death of a partner his interest in the goodwill ceased, and it survived to the surviving partner as his own property; this was doubted in *Crawshay* v. *Collins*, 15 Ves. 218, and it is not now nor anywhere regarded as the law in trade partnerships, and, though inseparable from the business, is an appreciable part of the assets in which the estate of a deceased partner can participate." Lindley says: "In the event of dissolution by death, it has been said that the goodwill survives, and there is a clear decision to that effect, but this is not in accordance with modern authorities. They are wholly opposed to the notion that the value of the goodwill as such belongs to the survivor." (2 Lindley on Partnership, sec. 443.) And our code declares (Civ. Code, sec. 993): The goodwill of a business is property transferable like any other.

It is not necessary to enter upon a discussion of the character of this intangible property known as goodwill. The code solves many doubts by defining it to be the "expectation of continued public patronage." (Civ. Code, sec. 992.)

Now the Newmans had purchased the interest of the estate in the assets as shown by the inventory, and had likewise acquired, as has been discussed, the right to continue the business under the firm name. We are unable to perceive any difference between the acquirement of a right to conduct this business under a firm name, and the acquirement of the goodwill of the business. In other words, every possible "expectation of continued public patronage" to the business was gone when the right to conduct it under the firm name was parted with. If there were left anything of value, however shadowy and unreal, it might be ground for saying that the goodwill yet remained to the estate, but the interest in the assets, together with the interest in the right to conduct the business under the firm name,

having passed to the Newmans, nothing in the nature of goodwill was left.

But there is another and equally convincing view which may be taken of these matters. Counsel have cited some cases in which it is said that it is the duty of the survivors to sell the property, and the business, as a going business, and also to continue the business until this can be done. It may be that when a firm name is not composed of the name of the partners, but is a trade name only, different equities may arise, but we are sure in this case the Newmans could not have been required, in the interest of Levinson's estate, to sell the right to continue the business in the firm name nor to sell the goodwill. There is not only the goodwill which belongs to the firm, but in a successful business each partner may have gained a business standing and a reputation which is of value to him. One who sells the goodwill of a business warrants by that very act that he will not endeavor to draw off any of the customers. (Civ. Code, sec. 1776.) If the surviving partners can be required to do this they are practically prohibited from pursuing the same business at that place, and that may be their only means of gaining a livelihood. When a partnership is dissolved by death, the survivors are absolved from all obligations, except to close out the partnership affairs and to account to the estate. They do not owe a duty to the estate of the deceased to abstain from business even in the same line as that in which the partnership was engaged.

We are forced to believe in this case that the articles of copartnership failed to provide, effectively, for a transfer of the interest of Levinson's estate in the copartnership to the surviving partners. The executor and his counsel were of the opinion that it did so provide, and acted accordingly. Though we are convinced that they were mistaken, we do not doubt that the estate of Levinson realized much more from the property than would have been possible if the firm had gone into liquidation, as they must have done in the absence

of the agreement. We think, therefore, that the agreement which the parties supposed they had made was to the material advantage of all concerned, and, had they provided for a valid method of determining the value of the interest of Levinson, it would have been legal as well as just.

For the lack of such method, however, the transfer to the Newmans was unauthorized and void. The legatees, however, of Levinson's estate were all of age, and the estate was solvent.

Knowing all of the essential facts, they demanded and received the proceeds of the sale over the protests of the executor and of the Newmans. These protests amounted to the claim that, unless the transfer to the Newmans was valid, the money should be returned to them. If the transfer was regarded as invalid, plainly that should have been done. The court could not distribute the money except upon the theory that it properly belonged to the estate. The Levinsons solicited and obtained such an adjudication, and they received the money so distributed.

No rights were or could have been reserved by the protest, styled a stipulation, which was filed by the Levinsons. The money was not voluntarily paid after the protest was made, but the payment was forced by the legatees. The protest does show, however, that the legatees knew, or at least suspected, that the executor and the surviving partners claimed that. the money in the hands of the executor was all that was coming to the estate from the partnership. It is stated, after admitting that the money was received by the executor "on account of the interest of said estate in the partnership assets," as follows: "But it is not admitted by said petitioners, or any of them, that no further sum remains due, or is to become due, from said surviving partners, or either of them, or assigns, to said estate, or to said petitioners, or any of them." There would have been no purpose in guarding against the implication if it had not been believed that the claim was that this was

all. That the legatees well knew the claim made by the surviving partners abundantly appears from the other evidence.

This was a ratification of the sale on the part of the legatees which can be avoided only for fraud discovered afterward, and then only upon a rescission and a restoration of all that they have received, or a showing of some excuse for not doing so.

The action is to compel the surviving partners to account for the interest of Levinson in the copartnership. But the moneys which were distributed upon the application of the legatees were paid for the entire interest of Levinson in the copartnership. To compel an accounting is to set aside or ignore that transaction. The money was not paid on account, and the legatees must have known that no such sum was due from the surviving partners to the estate, except upon the theory that they had purchased the interest of Levinson. The acceptance of the sum by the executor materially affected the condition of the surviving partners. But for that the concern would most likely have gone into liquidation, and large liabilities for goods would not have been incurred. They did not understand that they were assuming these liabilities and the risks of trade for the benefit of the estate of Levinson, but for themselves.

Rehearing denied.