[No. S037405. Dec. 14, 1995.]

AMWEST SURETY INSURANCE COMPANY, Plaintiff and Respondent,
v.
PETE WILSON, as Governor, etc., et al., Defendants and Respondents;
CHARLES QUACKENBUSH, as Commissioner, etc., Defendant and
Appellant;
VOTER REVOLT, Intervener and Appellant.

**COUNSEL**

Strumwasser & Woocher, Michael J. Strumwasser, Fredric D. Woocher and Susan L. Durbin for Defendant and Appellant.

Hall & Phillips, John R. Phillips, Carl H. Moor, Leon Dayan, Phillips, Cohen & Goldstein, Ann E. Carlson, Linda B. Popejoy, Hall & Associates, Carlyle W. Hall, Jr., Edward P. Howard and Gus T. May for Intervener and Appellant.

Christopher L. Kelley, Olson, Hagel, Fong, Leidigh, Waters & Fishburn and George Waters as Amici Curiae on behalf of Defendant and Appellant and Intervener and Appellant.

Larry A. Rothstein, Hufstedler, Kaus & Ettinger, Hufstedler & Kaus, Morrison & Foerster, Otto M. Kaus, John Sobieski, Thelen, Marrin, Johnson & Bridges and Curtis A. Cole for Plaintiff and Respondent.

Barger & Wolen, Kent R. Keller, Robert W. Hogeboom, Steven H. Weinstein, John C. Holmes and Lawrence F. Krutchik as Amici Curiae on behalf of Plaintiff and Respondent.

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Jack T. Kerry, Deputy Attorneys General, for Defendants and Respondents.

Michael L. Pinkerton as Amicus Curiae on behalf of Defendants and Respondents.

Paul R. Geissler, Craig A. Berrignton, David F. Snyder, James L. Kimble, Munger, Tolles & Olson, Allen M. Katz, Mark B. Helm, Gregg W. Kettles, Sidley & Austin, George Deukmejian, James M. Harris, Hill, Farrer & Burrill, Jack R. White and James R. Evans, Jr., as Amici Curiae on behalf of Plaintiff and Respondent and Defendants and Respondents.

## OPINION

**GEORGE, J.**—In 1988, the voters approved Proposition 103, an initiative measure entitled the Insurance Rate Reduction and Reform Act. Among other provisions affecting certain types of insurance, Proposition 103 imposed a rate rollback and required that any subsequent rate increase, prior to its use, be approved by the Insurance Commissioner. Section 8(b) of Proposition 103 provides: "The provisions of this act shall not be amended by the Legislature except to further its purposes . . . ." (Stats. 1988, p. A-290.)

In 1990, the Legislature enacted Insurance Code section 1861.135,[1] which exempts surety insurance from the rate rollback and rate approval provisions of Proposition 103. For the reasons that follow, we hold that section 1861.135 is invalid because it does not further the purposes of Proposition 103.

We also hold that the decision of the Court of Appeal in this case did not satisfy the requirement of article VI, section 14, of the California Constitution that decisions of the Supreme Court and the Courts of Appeal be in writing "with reasons stated," because the opinion announcing the judgment reflects the views of only the authoring justice. The only other justice who

---

[1]All further statutory references are to the Insurance Code unless otherwise indicated.

concurred in the judgment simply "concurred in the result," and did not state her reasons for doing so.

I

On November 8, 1988, the voters enacted the initiative measure designated Proposition 103 that, among other provisions, added article 10, entitled Reduction and Control of Insurance Rates, to chapter 9 of part 2, division 1, of the Insurance Code. (§ 1861.01 et seq.) The provisions of chapter 9 "apply to all insurance on risks or on operations in this state," with the exception of certain specified types of insurance. (§ 1851.) As discussed more fully below, surety insurance is not included among the exceptions specified in section 1851 and, therefore, is regulated by chapter 9. In adding article 10 to chapter 9, Proposition 103 provided to the same effect: "This article shall apply to all insurance on risks or on operations in this state, except those listed in Section 1851." (§ 1861.13.)

Section 1861.01, subdivision (a), of article 10 imposes a rollback of the rates (for all insurance regulated by chapter 9) to at least 20 percent less than the rate in effect one year prior to the enactment of Proposition 103. Subdivision (b) of section 1861.01 provides that, during the first year following the enactment of Proposition 103, these reduced rates could be increased only if the Insurance Commissioner found, after a hearing, that the insurer was "substantially threatened with insolvency."[2] Subdivision (c) of section 1861.01 provides that, commencing one year after the enactment of Proposition 103, "insurance rates subject to this chapter must be approved by the commissioner prior to their use."[3]

Section 1861.05, also enacted by Proposition 103, provides in subdivision (a): "No rate shall be approved or remain in effect which is excessive,

---

[2]As discussed below, this subdivision was held unconstitutional in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 815 [258 Cal.Rptr. 161, 771 P.2d 1247].

[3]Section 1861.01 provides in full: "(a) For any coverage for a policy for automobile and any other form of insurance subject to this chapter issued or renewed on or after November 8, 1988, every insurer shall reduce its charges to levels which are at least 20% less than the charges for the same coverage which were in effect on November 8, 1987. [¶] (b) Between November 8, 1988, and November 8, 1989, rates and premiums reduced pursuant to subdivision (a) may be only increased if the commissioner finds, after a hearing, that an insurer is substantially threatened with insolvency. [¶] (c) Commencing November 8, 1989, insurance rates subject to this chapter must be approved by the commissioner prior to their use. [¶] (d) For those who apply for an automobile insurance policy for the first time on or after November 8, 1988, the rate shall be 20% less than the rate which was in effect on November 8, 1987, for similarly situated risks. [¶] (e) Any separate affiliate of an insurer, established on or after November 8, 1987, shall be subject to the provisions of this section and shall reduce its charges to levels which are at least 20% less than the insurer's charges in effect on that date."

inadequate, unfairly discriminatory or otherwise in violation of this chapter." Subdivision (b) of section 1861.05 requires an insurer that desires to change a rate to file "a complete rate application with the commissioner." The remainder of section 1861.05 describes the information that a rate application must include and the procedures for ruling upon such applications.[4]

Section 8(b) of Proposition 103, which is not codified, states: "The provisions of this act shall not be amended by the Legislature except to further its purposes by a statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electorate." (Stats. 1988, p. A-290.)

On November 9, 1988, the day after Proposition 103 was enacted, Amwest Surety Insurance Company (Amwest) filed in superior court the present action against the Governor, the Attorney General, the Insurance Commissioner, and the State Board of Equalization, challenging the validity of Proposition 103 as applied to surety insurance[5] and seeking a writ of mandate or an injunction.

On May 4, 1989, in *Calfarm Ins. Co.* v. *Deukmejian, supra*, 48 Cal.3d 805, 815, we held unconstitutional section 1861.01, subdivision (b), which had precluded the commissioner from approving a rate increase before November 8, 1989, unless the insurer was substantially threatened with insolvency.

---

[4]As enacted, section 1861.05 stated: "(a) No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income. [¶] (b) Every insurer which desires to change any rate shall file a complete rate application with the commissioner. A complete rate application shall include all data referred to in Sections 1857.7, 1857.9, 1857.15, and 1864 and such other information as the commissioner may require. The applicant shall have the burden of proving that the requested rate change is justified and meets the requirements of this article. [¶] (c) The commissioner shall notify the public of any application by an insurer for a rate change. The application shall be deemed approved sixty days after public notice unless (1) a consumer or his or her representative requests a hearing within forty-five days of public notice and the commissioner grants the hearing, or determines not to grant the hearing and issues written findings in support of that decision, or (2) the commissioner on his or her own motion determines to hold a hearing, or (3) the proposed rate adjustment exceeds 7% of the then applicable rate for personal lines or 15% for commercial lines, in which case the commissioner must hold a hearing upon a timely request." This section was amended in 1992 (Stats. 1992, ch. 1257, § 1, operative July 1, 1993) and again in 1993 (Stats. 1993, ch. 646, § 1) to add language regarding the time period after which an application will be "deemed approved" if it has not been disapproved.

[5]"Suretyship may be defined as a contractual relation whereby one person engages to be answerable for the debt or default of another." (Elder, The Law of Suretyship (5th ed. 1951) § 1.1, p. 1, fn. omitted.) Surety bonds generally are considered a form of casualty insurance. (Keeton & Widiss, Insurance Law (1988) § 1.5(d), p. 27.)

We also held unconstitutional another section enacted by Proposition 103 that is not here at issue. Additionally, we held that the invalid sections were severable from the remainder of Proposition 103 and that, with those invalid sections severed, the remainder of Proposition 103 was facially valid.[6]

On August 24, 1990, the Governor signed into law Assembly Bill No. 3798, 1989-1990 Regular Session, which passed by unanimous vote of both houses of the Legislature. That bill added section 1861.135 to article 10, exempting surety insurance from the rate rollback and rate approval requirements of sections 1861.01 and 1861.05, and providing instead that rates for surety insurance "may be used immediately upon filing with the commissioner."[7]

In December, 1990, Voter Revolt, the organization that drafted Proposition 103 and campaigned for its passage, successfully sought to intervene in the present case in order to assert that newly enacted section 1861.135 was invalid because it did not further the purposes of Proposition 103 as required by section 8(b) of that initiative. The superior court subsequently ruled that section 1861.135 is valid. Voters Revolt and the Insurance Commissioner appealed.

The Court of Appeal was divided on this issue. The opinion announcing the judgment, authored by Justice Hinz, relied upon article II, section 10, subdivision (c), of the California Constitution, which provides that the Legislature may not amend or repeal an initiative statute without voter approval "unless the initiative statute permits amendment or repeal without their approval." Justice Hinz observed that section 8(b) of Proposition 103 permits legislative amendments that further the purposes of the initiative, but concluded section 1861.135 was invalid because it did not further the purposes of Proposition 103. Justice Kitching indicated she "concurred in the result." Justice Croskey dissented.

---

[6]One effect of the invalidation of section 1861.01, subdivision (b), was that insurers that concluded the reduced rates required by subdivision (a) of section 1861.01 were confiscatory could file an application for approval of a higher rate and, if such application were filed before November 8, 1989, could charge such higher rate, pending approval by the commissioner, until November 8, 1989. Effective that date, subdivision (c) of section 1861.01 required prior approval by the commissioner before an insurer could charge an increased rate.

[7]Section 1861.135 provides in full: "(a) Notwithstanding Section 1861.13, surety insurance shall not be subject to Sections 1861.01 and 1861.05; however, any rate, rating plan or rating system for surety insurance shall be filed with the commissioner before it may be used in this state, and that rate, rating plan, or rating system may be used immediately upon filing with the commissioner. [¶] (b) The rates for surety insurance shall not be excessive, inadequate, unfairly discriminatory, or otherwise in violation of this chapter, except Sections 1861.01 and 1861.05."

## II

Article II, section 10, subdivision (c), of the California Constitution states: "The Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." Section 8(b) of Proposition 103 permits such amendments without voter approval, but only "to further [the initiative's] purposes."

The parties agree that "[u]nder article II, section 10, subdivision (c) [of the California Constitution], the voters have the power to decide whether or not the Legislature can amend or repeal initiative statutes. This power is absolute and includes the power to enable legislative amendment *subject to conditions attached by the voters.* (See *Franchise Tax Bd.* v. *Cory* (1978) 80 Cal.App.3d 772, 776-777 [145 Cal.Rptr. 819].)" (*California Common Cause* v. *Fair Political Practices Com.* (1990) 221 Cal.App.3d 647, 652 [269 Cal.Rptr. 873], italics in original; *Huening* v. *Eu* (1991) 231 Cal.App.3d 766, 779 [282 Cal.Rptr. 664].) As the parties acknowledge, it follows that the validity of section 1861.135 depends upon whether it furthers the purposes of Proposition 103. The parties disagree, however, as to whether section 1861.135 furthers the purposes of Proposition 103, and what standard of review we should employ in deciding this question.

Amwest, relying upon the rule that "a strong presumption of constitutionality supports the Legislature's acts" (*California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 175 [148 Cal.Rptr. 875, 583 P.2d 729]), argues that we should adopt a deferential standard of review in determining whether the enactment of section 1861.135 furthers the purposes of Proposition 103.[8] Voters Revolt contends that determining whether the amendment furthers the purposes of Proposition 103 is simply a question of statutory interpretation that this court should consider de novo. It appears that the issue posed by these contentions is one of first impression.

It is common for an initiative measure to include a provision authorizing the Legislature to amend the initiative without voter approval only if the amendment furthers the purpose of the initiative (see, e.g., *Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 662 [47 Cal.Rptr.2d 108, 905 P.2d 1248]; *Huening* v. *Eu, supra,* 231 Cal.App.3d 766, 771-772, 779, fn. 4; *Franchise Tax Bd.* v. *Cory* (1978), 80 Cal.App.3d 772, 774 [145 Cal.Rptr.

---

[8]The Governor, the Attorney General, and the State Board of Equalization, which are represented in this court by the Attorney General, present arguments similar to those presented by Amwest. The Insurance Commissioner, represented in this court by separate counsel, presents arguments similar to those presented by Voters Revolt.

819]), but only one published decision has interpreted such language. (*In re Nose* (1924) 195 Cal. 91 [231 P. 561].)

*In re Nose, supra,* 195 Cal. 91, arose from a prosecution for conspiracy to violate the former Alien Land Law, an initiative measure providing, as enacted, that only aliens who were eligible to citizenship could " 'acquire, possess, enjoy[] and transfer real property, or any interest therein, in this state . . . .' " (*Id.* at p. 94, italics omitted; see *Porterfield* v. *Webb* (1924) 195 Cal. 71, 76-77 [231 P. 554] [decided the same day as *In re Nose*].) That initiative measure also provided: " 'The legislature may amend this act in furtherance of its purpose and to facilitate its operation.' " (*Porterfield* v. *Webb, supra,* 195 Cal. 71, 77.)

The Legislature proceeded to amend the Alien Land Act in several respects, including the addition of language to the section prohibiting ineligible aliens from owning or occupying real property. As amended, the statute provided that ineligible aliens could not " 'acquire, possess, enjoy, *use, cultivate, occupy* and transfer real property, or any interest therein, in this state, *and have in whole or in part the beneficial use thereof* . . . .' " (*In re Nose, supra,* 195 Cal. 91, 94, italics in original.) This court, with minimal discussion, concluded that these amendments were valid because they "in nowise enlarge upon the intent of the act but are in furtherance of its purpose and do in fact facilitate its operation." (*Id.* at p. 93.) It appears that this court in *In re Nose* considered the issue of whether the amendment furthered the purpose of the initiative to be a matter of statutory construction, but the discussion of the issue in that case is so brief that it is difficult to draw a firm conclusion.

Although no other published case has addressed the precise issue before us, some general propositions are well established. ■ "The determination of whether a particular program serves a public purpose is generally vested in the Legislature. [Citation.]" (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 583 [131 Cal.Rptr. 361, 551 P.2d 1193].) "[L]egislative findings, while not binding on the courts, are given great weight and will be upheld unless they are found to be unreasonable and arbitrary. [Citations.]" (*Ibid.*) But we also must enforce the provisions of our Constitution and "may not lightly disregard or blink at . . . a clear constitutional mandate." (*Id.* at p. 591.) "In considering the constitutionality of a legislative act we presume its validity, resolving all doubts in favor of the Act. Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act. [Citations.]" (*Id.* at p. 594.)

In *California Housing Finance Agency* v. *Patitucci, supra,* 22 Cal.3d 171, cited by Amwest, we considered the scope of article XXXIV, section 1, of

the California Constitution, which requires voter approval at local elections before a "low rent housing project" may be developed, constructed or acquired by a state public body. The Legislature sought to define the scope of article XXXIV by enacting a statute that states that a "low rent housing project" shall not include a privately owned development that is subject to ad valorem property taxes and in which less than half the units are made available to persons of low income. We deferred "to the Legislature's interpretation of article XXXIV," noting that " ' "[w]hen the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance." ' [Citations.]" (22 Cal.3d at p. 175.)

In the present case, however, the construction of article II, section 10, subdivision (c), of the California Constitution is not disputed. The parties agree that the Legislature has the authority to amend Proposition 103 without voter approval, but only to further the purposes of the initiative. In enacting section 1861.135, the Legislature did not purport to interpret the Constitution, but only to amend the statutory provisions enacted by Proposition 103. The issue before us is whether the Legislature exceeded its authority. The "rule of deference to legislative interpretation" of the California Constitution, therefore, has no application in the present case. We do, however, apply the general rule that "a strong presumption of constitutionality supports the Legislature's acts. [Citations.]" (*California Housing Finance Agency* v. *Patitucci, supra*, 22 Cal.3d 171, 175.)

Amwest also relies upon the rule according deference to the Legislature's determination that an urgency measure is " 'necessary for the immediate preservation of the public peace, health or safety . . . .' " (*Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412, 418 [84 P.2d 1034].) Generally, statutes enacted by the Legislature do not take effect on the date they are enacted. One effect of this delay is to allow the electors an opportunity to exercise the power of referendum to approve or reject such statutes in whole or in part. (Cal. Const., art. II, §§ 9, 10, & art. IV, § 8, subd. (c).) California Constitution, article IV, section 8, subdivision (c)(3), provides, as an exception to the general rule, that "urgency statutes shall go into effect immediately upon their enactment." Subdivision (d) states, in part: "Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety. A statement of facts constituting the necessity shall be set forth in one section of the bill." (Cal. Const., art. IV, § 8, subd. (d).)

In *Davis* v. *County of Los Angeles, supra*, 12 Cal.2d 412, 422, we adopted the rule that a declaration of urgency by the Legislature will not be declared invalid "unless it 'appears clearly and affirmatively from the legislature's

statement of facts that a public necessity does not exist.' [Citations.]" "If there is any doubt as to whether the facts do or do not state a case of immediate necessity, that doubt should be resolved in favor of the legislative declaration . . . ." (*Id.* at pp. 422-423.) The reason for this rule is that the question whether such necessity exists is one of fact to be determined by the Legislature. (*Id.* at pp. 420-421.)

In *Davis* v. *County of Los Angeles, supra,* 12 Cal.2d 412, however, this court utilized a different standard of review to determine whether the urgency legislation at issue comported with the further limitation upon the authority of the Legislature imposed by the predecessor to California Constitution, article IV, section 8, subdivision (d), which stated then, as does the current provision: "An urgency statute may not create or abolish any office or change the salary, term, or duties of any office, or grant any franchise or special privilege, or create any vested right or interest." Although this court accorded great deference to the Legislature's factual determination that urgency legislation was necessary, we went on to consider, as a question of law, whether the urgency measure at issue "create[d] any office or change[d] the salary or duties of any officer, or create[d] any vested right or interest." (12 Cal.2d at p. 423.) In addressing this issue, we simply examined the provisions of the statute and determined that they were not of the type forbidden in urgency legislation. (*Id.* at pp. 423-425.) We earlier had utilized the same approach in *Stockburger* v. *Jordan* (1938) 10 Cal.2d 636, 642-643 [76 P.2d 674]. (See also *People* v. *Robertson* (1982) 33 Cal.3d 21, 46-47 [188 Cal.Rptr. 77, 655 P.2d 279]; *Flournoy* v. *Priest* (1971) 5 Cal.3d 350, 354-355 [95 Cal.Rptr. 793, 486 P.2d 689].)

*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56 [81 Cal.Rptr. 465, 460 P.2d 137] involved application of the rule that the authority of the Legislature to enact laws governing "home rule charter cities" is limited to "matters which are of statewide concern." (*Id.* at p. 61; Cal. Const., art. XI, § 5.) We held: "In exercising the judicial function of deciding whether a matter is a municipal affair or of statewide concern, the courts will of course give great weight to the purpose of the Legislature in enacting general laws which disclose an intent to preempt the field to the exclusion of local regulation [citation], and it may well occur that in some cases the factors which influenced the Legislature to adopt the general laws may likewise lead the courts to the conclusion that the matter is of statewide rather than merely local concern. However, the fact, standing alone, that the Legislature has attempted to deal with a particular subject on a statewide basis is not determinative of the issue as between state and municipal affairs, nor does it impair the constitutional authority of a home rule city or county to enact and enforce its own regulations to the exclusion of general laws if the subject is

held by the courts to be a municipal affair rather than of statewide concern; stated otherwise, the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern." (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63, fn. omitted; *DeVita* v. *County of Napa* (1995) 9 Cal.4th 763, 783 [38 Cal.Rptr.2d 699, 889 P.2d 1019]; *Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 405 [14 Cal.Rptr.2d 470, 841 P.2d 990]; *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 566 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

In *Martin* v. *Riley* (1942) 20 Cal.2d 28 [123 P.2d 488] we considered whether urgency legislation that reorganized the State Guard during World War II was invalid because it changed the salary, term, or duties of officers of the State Guard. This court considered the provisions of the statute and concluded, as a matter of law, that the urgency legislation did not "change[] the duties of any officer within the meaning of the Constitution." (*Id.* at p. 38.)

The urgency legislation at issue in *Martin* v. *Riley* was enacted during an extraordinary session of the Legislature convened by the Governor. This court considered an argument that the resulting legislation was invalid because it did not fall within the subjects the Legislature was convened to consider. In rejecting the foregoing contention, this court stated: "The duty of the Legislature in special session to confine itself to the subject matter of the call is of course mandatory. It has no power to legislate on any subject not specified in the proclamation. [Citations.]" (*Martin* v. *Riley, supra,* 20 Cal.2d 28, 39.) We then cited with approval the following language: " 'Legislative power, except where the constitution has imposed limits upon it, is practically absolute; and where limitations upon it are imposed they are to be strictly construed, and are not to be given effect as against the general power of the legislature, unless such limitations clearly inhibit the act in question.' " (*Ibid.*) We concluded: "Inasmuch as the presumptions are in favor of the constitutionality of the act, it will be held to be constitutional if by any reasonable construction of the language of the proclamation it can be said that the subject of legislation is embraced therein. [Citations.]" (*Id.* at p. 40.) Applying this standard, we compared the evident purposes for which the Legislature was called into special session with the provisions of the resulting legislation and concluded that the legislation was valid. A similar standard of review applies in the present case.

Pursuant to article II, section 10, subdivision (c), of the California Constitution, the Legislature lacks the authority to amend Proposition 103 except to further the purposes of the initiative. Such a limitation upon the power of the Legislature must be strictly construed, but it also must be given the effect

the voters intended it to have. Adoption of the standard of review proposed by Amwest might well have the ironic and unfortunate consequence of causing the drafters of future initiatives to hesitate to grant even a limited authority to the Legislature to amend those initiatives. As the Commissioner and Voter Revolt have pointed out, article II, section 10, subdivision (c), prohibits the Legislature from amending an initiative without voter approval unless the initiative grants the Legislature such authority. In the absence of effective judicial review, drafters of future initiatives might well feel compelled to withhold such legislative authority completely, lest even the most limited grant of authority to amend be used by the Legislature to curtail the scope of the initiative. As a result, the Legislature would be prohibited from making even minor, technical alterations to an initiative to correct drafting errors or facilitate the initiative's operation in changed circumstances. Such a result would diminish both the initiative process and the legislative process. Accordingly, starting with the presumption that the Legislature acted within its authority, we shall uphold the validity of section 1861.135 if, by any reasonable construction, it can be said that the statute furthers the purposes of Proposition 103.

### III

■ Amwest and its supporting amicus curiae, Surety Company of the Pacific, argue that in determining the purposes of Proposition 103, we are limited to the express statement of purpose included in the initiative which, in general terms, identifies such laudable goals as protecting consumers, encouraging a competitive insurance market, and ensuring that insurance rates are fair and affordable.[9] We are aware of no case that holds that we are so constrained. To the contrary, in construing a constitutional amendment enacted by initiative, we observed: "Where, as here, a constitutional amendment is subject to varying interpretations, evidence of its purpose may be drawn from many sources, including the historical context of the amendment, and the ballot arguments favoring the measure. [Citations.]" (*California Housing Finance Agency* v. *Patitucci, supra*, 22 Cal.3d 171, 177.)

In *Fay* v. *District Court of Appeal* (1927) 200 Cal. 522 [254 P. 896] we noted that the express purpose of the constitutional amendment creating the Judicial Council "was that of 'simplifying and improving the administration of justice,' 'the expedition of business[,]'[] the adoption or amendment of 'rules of practice and procedure for the several courts,' and the making and

---

[9]Section 2 of Proposition 103, entitled "Purpose," states: "The purpose of this chapter is to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians." (Stats. 1988, p. A-276.)

receiving of reports 'respecting the condition and manner of disposal of judicial business.' " (*Id.* at p. 527.) In determining the purposes of the amendment, however, we did not limit our view to these general statements appearing in the amendment. Instead, we "examine[d] this amendment as a whole" and concluded that its "two main purposes" were to "create a judicial council" and "to invest the chief justice of the state, acting *ex officio* as chairman of the judicial council, with certain powers and functions." (*Id.* at p. 537.) In the same manner, in discerning the purposes of Proposition 103, we are guided by, but are not limited to, the general statement of purpose found in the initiative.

In order to determine the purposes of Proposition 103, it is helpful to review briefly the manner in which rates of insurance were regulated prior to the passage of the initiative.

In 1944, the United States Supreme Court held that the commerce clause grants Congress the power to regulate insurance transactions conducted across state lines and that such transactions are subject to the provisions of the Sherman Antitrust Act. (*U.S.* v. *Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162].) Chief Justice Stone observed in dissent that "the immediate and only practical effect of the decision . . . is to withdraw from the states, in large measure, the regulation of insurance and to confer it on the national government, which has adopted no legislative policy and evolved no scheme of regulation with respect to the business of insurance." (*Id.* at pp. 580-581 [88 L.Ed. at p. 1473] (dis. opn. of Stone, C. J.).)

"The impact of the court's decision was almost immediately restricted through the enactment of the McCarran-Ferguson Act, which declared that the business of insurance should continue to be 'subject to the laws of the several States which relate to the regulation or taxation of such business.' However, the act also provided that federal regulatory legislation would be 'applicable to the business of insurance *to the extent that such business is not regulated by State law.*' " (Keeton & Widiss, Insurance Law, *supra*, § 8.1(a), pp. 931-932, fns. omitted, italics in original.)

"Promptly after the McCarran-Ferguson Act was adopted, state insurance commissioners and industry representatives joined forces in a nationwide movement which sought the enactment in every state of legislation that would satisfy the requirements for state regulation established by the McCarran-Ferguson Act and thereby exempt insurers from federal regulatory legislation." (Keeton & Widiss, *supra*, § 8.1(a), p. 932.) In 1946, a model act was drafted. (1 Cal. Insurance Law & Practice (1995) § 6A.03[3], p. 6A-15.) "[B]y 1950 rate regulatory legislation had been adopted in every state."

(Keeton & Widiss, *supra*, § 8.1(a), p. 932, fn. omitted.) Most of these laws adopted the basic standard of the model act that no rate shall be "excessive, inadequate, or unfairly discriminatory." (1 Cal. Insurance Law & Practice, *supra*, § 6A.03[3], p. 6A-16.)

California enacted the McBride-Grunsky Insurance Regulatory Act of 1947 which added chapter 9 to part 2, division 1, of the Insurance Code. (§ 1850 et seq.) Employing language from the model act, the McBride-Grunsky Act stated that one purpose of chapter 9 was to regulate the rates of most types of insurance "to the end that they shall not be excessive, inadequate or unfairly discriminatory." (Former § 1850, enacted by Stats. 1947, ch. 805, § 1, p. 1896.) The Legislature emphasized, however, that this goal was to be achieved through open competition in the insurance market rather than by state regulation: "It is the express intent of this chapter to permit and encourage competition between insurers on a sound financial basis and nothing in this chapter is intended to give the Commissioner power to fix and determine a rate level by classification or otherwise." (*Ibid.*)

This reliance upon competition between insurance companies to control rates also was reflected in former section 1852, which declared that "[r]ates shall not be excessive or inadequate, as herein defined, nor shall they be unfairly discriminatory," but further provided: "No rate shall be held to be excessive unless (1) such rate is unreasonably high for the insurance provided and (2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable." (Stats. 1947, ch. 805, § 1, pp. 1897-1898.) Section 1851 then stated, as it does now, that chapter 9 applies "to all insurance on risks or on operations in this State," except for specified types of insurance. Surety insurance was not exempted from the ambit of chapter 9.[10] To the contrary, section 1850.4, then as now, defines "casualty insurance" to include surety insurance.

The provisions of chapter 9 described above remained essentially unchanged until the passage of Proposition 103.

That initiative declared: "Enormous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians. [¶] The existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates. [¶] Therefore,

---

[10]Section 1851 was amended in 1949 to delete the exemption for "[c]redit insurance" and again in 1982 to restate the exemption for workers' compensation insurance. Section 1851 currently exempts from the provisions of chapter 9 reinsurance, life insurance, marine insurance policies, title insurance, disability insurance, workers' compensation insurance, mortgage insurance, and "[i]nsurance transacted by county mutual fire insurers or county mutual fire reinsurers."

the People of California declare that insurance reform is necessary." (Stats. 1988, p. A-276.) This reform included a reduction of rates to a level "at least 20 [percent] less" than those in effect on November 8, 1987 (§ 1861.01, subd. (a)), as well as the repeal of former sections 1850 and 1852, which had relied upon competition between insurers to regulate rates. The initiative adopted instead a system in which insurance rates would have to be approved by the commissioner (who now was to be elected rather than appointed) "prior to their use." (§ 1861.01, subd. (c).)

Like the former law, Proposition 103 utilizes the basic standard that "[n]o rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter." (§ 1861.05, subdivision (a).) But unlike former section 1852, which declared that "[n]o rate shall be held to be excessive unless . . . a reasonable degree of competition does not exist in the area" (Stats. 1947, ch. 805, § 1, pp. 1897-1898), Proposition 103 directs that "[i]n considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition . . . ." (§ 1861.05, subd. (a).) No provision of Proposition 103 purports to alter the scope of chapter 9 as defined in sections 1850.4 and 1851. To the contrary, section 1861.13 states that article 10 "shall apply to all insurance on risks or on operations in this state, except those listed in Section 1851."

It is apparent from the foregoing that two major purposes of Proposition 103 were to reduce, by at least 20 percent, the rates for all insurance regulated under chapter 9 and to replace the former system for regulating insurance rates (which relied primarily upon competition between insurance companies) with a system in which the commissioner must approve such rates prior to their use.

In 1990, the Legislature amended Proposition 103 by enacting section 1861.135. Subdivision (a) of that statute provides that "surety insurance shall not be subject to Sections 1861.01 [which includes the rate rollback requirement and the requirement that the commissioner approve all rates prior to their use] and 1861.05 [which requires the filing of an application with the commissioner to change any rate]." (§ 1861.135, subd. (a).) Instead, subdivision (a) simply requires that a rate for surety insurance "shall be filed with the commissioner before it may be used," but permits such rate to be used "immediately upon filing with the commissioner." (*Ibid.*) Subdivision (b) of section 1861.135 provides that "rates for surety insurance shall not be excessive, inadequate, [or] unfairly discriminatory . . . ."

Amwest contends that the enactment of section 1861.135 furthers the purposes of Proposition 103 by clarifying whether surety insurance was

meant to be included within the ambit of Proposition 103. This was the reason given by the Legislature for amending Proposition 103. An uncodified section of the act creating section 1861.135 states that the act "furthers the purpose of Proposition 103 by clarifying the applicability of the proposition to surety insurance." (Stats. 1990, ch. 562, § 2.)

But the Legislature's action constituted an alteration rather than a clarification of the initiative. It was clear prior to the passage of Proposition 103 that the provisions of chapter 9 regulating insurance rates applied to surety insurance. (§§ 1850.4, 1851.) Proposition 103 fundamentally altered the method of regulating insurance rates set forth in chapter 9 but did not alter the types of insurance that were regulated.

The Attorney General concedes that "Prop 103 includes surety insurance" and that there is no "*patent* ambiguity" on this point. (Italics in original.) The Attorney General argues instead that "notwithstanding the certainty of surety's inclusion in Prop 103, the Initiative might contain an anomaly or *latent* ambiguity, hidden and not apparent, by virtue of the fact that certain key attributes presumed to apply to all classes of insurance named in Prop 103, might in fact not apply to surety." (Italics in original.) The circumstance that surety insurance differs in material respects from other forms of insurance governed by Proposition 103 is relevant to resolution of the question whether surety insurance *should* have been included within the ambit of the initiative (a point we shall discuss below), but this circumstance does not render the initiative ambiguous or in need of clarification as to whether Proposition 103 applies to surety insurance. It is clear that it does.

Amwest argues that clarification was "sorely needed" because the materials submitted to the voters regarding Proposition 103 did not mention surety insurance and did not include either the text or a summary of section 1851. Amwest concludes it is unlikely the voters understood that Proposition 103 applied to surety insurance, and contends "it would further the purposes of the Proposition to make it say what the voters thought it meant." In *Wright* v. *Jordan* (1923) 192 Cal. 704, 713 [221 P. 915] we rejected a similar argument that the voters intended a constitutional amendment passed by initiative to have a narrower scope than would follow from its broad language, stating in our opinion: "We cannot adopt this narrow interpretation of said subdivision in said amendment to the constitution in view of the particular language of said subdivision . . . . The criticism which the respondent makes as to the details of the method by which this amendment to the constitution was adopted constitutes matter which cannot be taken advantage of by him in this proceeding, since it amounts merely to a collateral attack upon an amendment to the constitution which has been adopted by a majority vote of the people, who must be assumed to have

voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election and which they must be assumed to have duly considered, regardless of any insufficient recitals in the instructions to voters or the arguments *pro* and *con* of its advocates or opponents accompanying the text of the proposed measure." (Cf. *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 252 [186 Cal.Rptr. 30, 651 P.2d 274]; *Fair Political Practice Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 42 [157 Cal.Rptr. 855, 599 P.2d 46]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 243-244 [149 Cal.Rptr. 239, 583 P.2d 1281]; see also *Taxpayers To Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 768 [274 Cal.Rptr. 787, 799 P.2d 1220].)

It is clear from the foregoing that the Legislature's stated purpose in enacting section 1861.135—to clarify the scope of Proposition 103—does not withstand scrutiny. There was no doubt prior to the passage of Proposition 103 that the insurance regulations set forth in chapter 9 applied to surety insurance. The initiative altered the substance of those regulations but did not purport to alter the scope of chapter 9. Accordingly, it was clear that the provisions of Proposition 103 applied to surety insurance. Section 1861.135, therefore, did not further the purposes of Proposition 103 by clarifying whether the proposition applied to surety insurance; instead it altered its terms in a significant respect.

■ Another question presented by the issue before us is whether exempting surety insurance from some of the provisions of Proposition 103 furthers the purposes of the proposition. Amwest argues that exempting surety insurance from the rate rollback and prior-approval provisions of Proposition 103 furthers the purposes of the proposition, because the rates for surety insurance long have been stable and reasonable and, therefore, it was unnecessary to apply these provisions to surety insurance—and because exempting surety insurance permits the commissioner to focus more attention upon other types of insurance, such as automobile insurance, which were of greater concern to the voters in approving Proposition 103. We first address the contention that reform of the method of setting rates for surety insurance was unnecessary.

As we already have observed, Proposition 103, in an uncodified section, stated that insurance reform was necessary because "[e]normous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians. [¶] The existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates." (Stats. 1988, p. A-276.) Amwest contends that, in enacting section 1861.135, the Legislature relied upon evidence that the field of

surety insurance was highly competitive, resulting in rates that were affordable and stable during the past decade. But it does not follow from the circumstance that rates for surety insurance were stable and affordable, at the time Proposition 103 was passed, that surety insurance should be exempted from the provisions of Proposition 103.

As noted above, Proposition 103 mandated a general reform of the system of insurance regulation embodied in chapter 9. Section 1861.135 did not exempt surety insurance from the ambit of chapter 9. Rather, that statute exempted surety insurance only from the rate rollback provision and the provisions requiring prior approval of the commissioner for a change in rates.

We must determine, therefore, whether exempting surety insurance from the rate rollback provision of Proposition 103 furthered the purposes of the initiative for the reason that a rate reduction was unnecessary in the case of surety insurance. Proposition 103 accounted for the circumstance that the rates for some forms of insurance had risen more quickly than others by basing the amount of the required rollback upon the rate charged approximately one year prior to the passage of Proposition 103. Rates that had not risen significantly during that period would be rolled back 20 percent, whereas rates that had risen more substantially would be subject to a proportionately greater reduction.

Prior to the enactment of section 1861.135, the effect of this rollback provision was reduced significantly by our decision in *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, 815. As noted above, *Calfarm* held unconstitutional section 1861.01, subdivision (b), which precluded the commissioner from approving a rate increase before November 8, 1989, unless the insurer substantially was threatened with insolvency. Following *Calfarm,* therefore, if the required rate rollback resulted in a confiscatory rate, the insurer immediately could apply for a rate increase and use the proposed rate pending the commissioner's ruling. At the time section 1861.135 was enacted, the rate rollback provision of Proposition 103 was tempered by the further requirement that the reduced rate provide a fair and reasonable return on the insurer's investment. (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, 819.) If the rates for surety insurance already were fair and reasonable, the rate rollback might, in large part, be avoided.[11]

The apparent purpose of the rate rollback provision, as interpreted in *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, was to ensure that

---

[11]The Attorney General concedes this point, observing that "all insurers were relieved of [the rate rollback] requirement by the *Calfarm*" decision, and concluding that, "in truth, the only on-going provision of Prop 103 from which surety insurance was exempted by [section 1861.135] is the prior approval requirement of § 1861.05. [Fn. omitted.]"

rates were fair and reasonable at the inception of the regulations promulgated in Proposition 103. Exempting surety insurance from this provision does not further that purpose.

Exempting surety insurance from the requirement that the commissioner approve any rate change prior to its use likewise fails to further the purposes of Proposition 103. The circumstance that the rates charged for surety insurance, in the past, have been reasonable and stable also does not establish that it is unnecessary to apply to surety insurance the provisions of Proposition 103 that require prior approval of rate changes. The apparent purpose of the prior-approval provisions embodied in sections 1861.01, subdivision (c), and 1861.05 is to prevent *future* abuses in setting insurance rates, by requiring the commissioner to determine whether a proposed rate change is fair and reasonable before it is implemented. As noted above, chapter 9 applies to all but a few of the many classes of insurance in this state.[12] The prior-approval provisions provide the commissioner with the authority to approve or disapprove the proposed rates for all types of insurance regulated by chapter 9. This purpose of empowering the commissioner to regulate most insurance rates prior to their use is not furthered by exempting surety insurance from these requirements.

Amwest contends that section 1861.135 furthers the purposes of Proposition 103 by lessening the regulatory burden on the commissioner.[13] This argument contains an inherent contradiction, because a central purpose of Proposition 103 was to increase the duties of the commissioner by requiring that this official approve all rate changes prior to their use. In passing Proposition 103, therefore, the voters contemplated that the administrative burden on the commissioner would be increased dramatically. Attempting to lessen this increase in the regulatory burden on the commissioner by reducing the scope of the initiative, rather than by providing the commissioner with sufficient additional staff and other resources, would seem to run counter to the purpose of Proposition 103.

It is true that excluding some forms of insurance from the requirement that all rate changes be approved by the commissioner prior to their use would

---

[12]Section 100 defines 20 classes of insurance, the final class being "[m]iscellaneous." Only eight types of insurance are exempted from the scope of chapter 9. (§ 1851.)

[13]On July 11, 1994, Amwest filed a motion to strike certain statements appearing in the briefs filed by Voters Revolt and the Insurance Commissioner to the effect that the Legislature, in enacting section 1861.135, did not consider as one of its purposes lightening the administrative burden of the Insurance Commissioner. In the alternative, Amwest requests that this court take judicial notice of some handwritten copies of documents, the authors of which are not disclosed, contained in the files of Assemblyman Patrick Johnston, one of the authors of the bill that enacted section 1861.135. The motion to strike and the request for judicial notice are denied. (*State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5, 10, fn. 3 [219 Cal.Rptr. 13, 706 P.2d 1146]; Evid. Code, § 452, subd. (c) ["Judicial notice may be taken of . . . [¶] . . . [¶] (c) Official acts of the legislative . . . departments . . . of any state . . . ."].)

allow the commissioner to focus greater resources upon the remaining forms of insurance covered by chapter 9, but this premise cannot properly be said to further the purposes of Proposition 103, because the voters, in passing that initiative measure, did not limit its provisions to a few forms of insurance of greatest concern to the public, but rather chose to require pre-approval of rates for *all* types of insurance covered by chapter 9.

Regardless whether the voters understood that surety insurance specifically would be regulated by Proposition 103, they knew that the initiative was not limited to a few forms of insurance but, instead, was intended to apply broadly to large classes of insurance. The ballot pamphlet distributed to the voters prior to the November 8, 1988, General Election stated in the official title and summary prepared by the Attorney General that Proposition 103 applied to "automobile and other property/casualty insurance." The analysis by the Legislative Analyst that followed the summary included the following: "Various types of insurance are sold in California, including automobile, liability, fire, health and life. . . . [¶] . . . [¶] In summary, this measure: [¶] Requires insurance companies to reduce rates for various types of insurance, including motor vehicle, fire and liability. [¶] . . . [¶] Requires the Insurance Commissioner to review and approve rate increases—for various types of insurance—before they can take effect. [¶] . . . [¶] This measure changes the laws that regulate insurance rates for certain types of insurance. It applies to motor vehicle, fire and liability insurance, but not to life, mortgage and disability insurance." Section 1 of the text of the proposed law uses, in an uncodified section, the broad phrase "property-casualty insurance" (Stats. 1988, p. A-276) and further states, in section 1861.13: "This article shall apply to all insurance on risks or on operations in this state, except those listed in Section 1851."

The voters intended that Proposition 103 have broad application to various types of insurance. Limiting the scope of the initiative by excluding some forms of insurance would not further the purposes of Proposition 103's broad reform of the insurance regulations embodied in chapter 9, even if such exclusions lessened to some degree the administrative burdens upon the commissioner.

Amwest contends that our decision in *Calfarm* temporarily increased the administrative burden on the commissioner in a manner not contemplated by the voters in passing Proposition 103. As enacted by the voters, Proposition 103 permitted an increase in rates before November 8, 1989, only if the insurer "is substantially threatened with insolvency." (§ 1861.01, subd. (b).) Amwest maintains that our decision in *Calfarm* (filed on May 4, 1989), invalidating this provision, permitted a greater number of insurers to seek the commissioner's approval of rate increases during the remainder of the first year following passage of Proposition 103.

Even if we were to assume that our decision in *Calfarm* temporarily increased the administrative burden on the commissioner, section 1861.135 cannot be sustained on such a theory. There is nothing in the legislative history of that statute or in the record before us to indicate that excluding surety insurance would have an appreciable impact upon the commissioner's ability to manage any temporary increase in rate change applications following our decision in *Calfarm*. To the contrary, the Attorney General asserts that "surety represents less than 1% of the $26 billion property-casualty business in California"—a representation indicating that exempting surety insurance from the prior approval provisions of Proposition 103 would do little to relieve the administrative burden on the commissioner. Nor does it appear that the Legislature's purpose in enacting section 1861.135 was to lessen the administrative burden on the commissioner.

Assuming that exempting surety insurance would free significant resources that could be focused upon the temporary increase in rate change applications for *other* types of insurance (which, presumably, were of greater concern to the voters in passing Proposition 103), it would not further the purposes of Proposition 103 permanently to exclude surety insurance from the rate regulatory provisions of the initiative in order to lessen the burden on the commissioner for a six-month period.

■ In sum, we conclude that section 1861.135, which excludes surety insurance from the rate rollback and rate prior-approval provisions of sections 1861.01 and 1861.05, does not further the purposes of Proposition 103—an initiative intended to reform the regulation of all types of insurance covered by chapter 9, including surety insurance. In so holding, we do not question the wisdom of the Legislature in enacting section 1861.135. (*Estate of Horman* (1971) 5 Cal.3d 62, 77 [95 Cal.Rptr. 433, 485 P.2d 785].) The question before us is not whether exempting surety insurance from some of the provisions of Proposition 103 furthers the public good, but rather whether doing so furthers the purposes of Proposition 103. We hold that it does not. Because Proposition 103 expressly permits its provisions to be amended without voter approval, but only when to do so would further the purposes of the initiative, section 1861.135 is invalid.

IV

■ We granted review to decide the further question whether the decision of the Court of Appeal satisfies the requirement of article VI, section 14, of the California Constitution that decisions of the Supreme Court and the Courts of Appeal be in writing "with reasons stated." For the reasons that follow, we hold that the decision of the intermediate appellate court does not satisfy this requirement.

As noted above, Justice Hinz authored the opinion announcing the judgment of the Court of Appeal. Justice Kitching only "concurred in the result." Acting Presiding Justice Croskey wrote a dissenting opinion.

Amwest argues that, because Justice Kitching concurred in the judgment but did not join in the lead opinion written by Justice Hinz setting forth the reasoning employed to reach that result, the decision of the Court of Appeal "lacks the concurrence of the required majority of qualified judges." (Cal. Rules of Court, rule 29(a).) We disagree. California Constitution, article VI, section 3, states that a Court of Appeal "shall conduct itself as a 3-judge court" and adds: "Concurrence of 2 judges present at the argument is necessary for a judgment." In the present case, Justice Kitching explicitly concurred in the result pronounced in the opinion written by Justice Hinz. Two justices thus concurred in the judgment. The question remains, however, whether the decision satisfies the requirement of article VI, section 14, of the California Constitution that it be in writing "with reasons stated."

Because our present opinion supersedes the Court of Appeal decision, any deficiencies in that decision are rendered moot. Nevertheless, we shall address the adequacy of the decision of the intermediate appellate court, because this is an issue of statewide importance that is likely to recur. (*Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 746-747 [872 P.2d 143].)

Article VI, section 2, of the California Constitution of 1879 stated, in part: "In the determination of causes, all decisions of the court . . . shall be given in writing, and the grounds of the decision shall be stated." In 1966, this language was deleted and article VI, section 14, was amended to include the following language: "Decisions of the Supreme Court and courts of appeal that determine causes shall be in writing with reasons stated."

*Philbrook* v. *Newman* (1905) 148 Cal. 172 [82 P. 772] involved an attempt by the losing party to vacate an earlier decision of this court entitled *Rankin* v. *Newman* (1896) 114 Cal. 635 [46 P. 742] on the ground, among others, that the opinion in *Rankin* failed to state the "grounds of the decision" as required by former article VI, section 2 of the California Constitution of 1879. The opinion announcing the judgment of the court in *Rankin* was signed by three justices. The concurring opinion was signed by three other justices. (The opinion does not explain why the seventh justice of the court did not participate in the decision.) All six justices who participated in the decision, therefore, concurred in the judgment, but a majority of the court failed to agree on the reasoning employed in reaching that conclusion. This court held in *Philbrook* that the foregoing statements of the justices' positions constituted "a sufficient compliance with the constitutional requirement

that the decisions of this court must state the 'grounds of the decision.' " (*Philbrook* v. *Newman, supra,* 148 Cal. 172, 179.) We explained: "The concurrence of four justices is necessary to pronounce a judgment of the court . . . , but it is not necessary to the validity of such a judgment that four shall concur therein upon the same grounds, provided they all concur in the same judgment." (*Ibid.*) In language fully applicable to the question before us in the present case, we stated in *Philbrook*: "It is sufficient, for any purpose contemplated by the constitution, if the grounds upon which the respective justices concur in the judgment are somewhere stated in the respective opinions delivered." (*Ibid.*)

In the present case, it is unclear whether the lead opinion authored by Justice Hinz states the grounds upon which the two justices who comprised the majority in the Court of Appeal concurred in the judgment, because Justice Kitching only "concurred in the result." The notation that a justice concurs "in the result" or "in the judgment" is equivocal. "It could mean that the concurring justice does not agree with the principles; or that [the justice] agrees with the principles or some of them but not with the manner of their statement or the reasoning or authorities set forth in support of them; or that [the justice] neither agrees nor disagrees but wishes to stay aloof and keep himself [or herself] intellectually free to examine the question anew at some later date (perhaps as the author of an opinion); or that [the justice] objects to something in the opinion—a quotation, reliance on an authority that is anathema to him [or her], humor or satire, or castigation of a litigant or counsel—and withholds his [or her] signature because the author would not take it out." (Witkin, Manual on Appellate Court Opinions (1977) § 115, p. 223.)

Because the reasons that led Justice Kitching to concur in the judgment cannot be determined in the present case, the decision of the Court of Appeal fails to satisfy the constitutional requirement that the reasons for the decision rendered by the appellate court be stated in writing.

In a lengthy footnote, Voter Revolt cites numerous cases in which one or more justices of this court or the Court of Appeal have concurred in only the judgment or the result. In all but a few of these cases, however, the views of a majority of the court supporting the judgment were reflected in one or more written opinions, thus satisfying the requirement of article VI, section 14, of the California Constitution that the decision of the court be in writing "with reasons stated."[14]

In only a few of the cases cited by Voter Revolt is it uncertain whether the written opinions reflect the views of a majority of the justices supporting the

[14]This practice of concurring in only the judgment or the result, although not prohibited, has been criticized. Witkin has written: "The cryptic statement, 'I concur in the judgment,' has bothered many readers. [¶] (a) It produces all the evils of a concurring opinion with none

judgment by reason of one or more justices having concurred only "in the result" or "in the judgment." (See, e.g., *Draper* v. *City of Los Angeles* (1990) 52 Cal.3d 502, 509 [276 Cal.Rptr. 864, 802 P.2d 367]; *John A.* v. *San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 310 [187 Cal.Rptr. 472, 654 P.2d 242]; *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 105 [154 Cal.Rptr. 734, 593 P.2d 595]; *Williams* v. *County of Los Angeles* (1978) 22 Cal.3d 731, 737 [150 Cal.Rptr. 475, 586 P.2d 956]; *In re Andres M.* (1993) 18 Cal.App.4th 1092, 1101 [23 Cal.Rptr.2d 170]; *Estate of Meeker* (1993) 13 Cal.App.4th 1099, 1106 [16 Cal.Rptr.2d 825].) In none of these cases, however, did the parties raise the issue now before us, so these cases express no holding concerning the requirement of article VI, section 14, of the California Constitution that the decision of an appellate court be in writing "with reasons stated." (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["an opinion is not authority for a proposition not therein considered"].)

For the reasons stated above, we hold that the decision of the Court of Appeal did not satisfy the requirement of article VI, section 14, of the California Constitution that it be in writing "with reasons stated."

V

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment.[1]

I am at one with the majority in their conclusion that the judgment of the Court of Appeal must be affirmed. In this cause, we are required to undertake an *independent* determination whether Insurance Code section 1861.135

---

of its values; i.e., it casts doubt on the principles declared in the main opinion without indicating why they are wrong or questionable. [¶] (b) It is equivocal . . . . [¶] This uninformative statement should be used sparingly." (Witkin, Manual on Appellate Court Opinions, *supra*, § 115, p. 223.)

[1]*Pace* Witkin, the declaration, "I concur in the judgment," is not at all "cryptic." (Witkin, Manual on Appellate Court Opinions (1977) § 115, p. 223.) Neither is the statement, "I concur in the result." Generally speaking, the former indicates agreement with both the court's disposition and the issues it reaches or the rationale it employs (see, e.g., *United States* v. *Place* (1983) 462 U.S. 696, 710-711 [77 L.Ed.2d 110, 122-124, 103 S.Ct. 2637] (Brennan, J., conc. in result); *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 162 [18 L.Ed.2d 1094, 1115, 87 S.Ct. 1975] (Warren, C. J., conc. in result))—albeit not necessarily with the precise resolution of those issues or the specific use of that rationale. The latter, by contrast, signifies agreement with the disposition alone. (E.g., *United States* v. *Place*, *supra*, 462 U.S. at pp. 710-711 [77 L.Ed.2d at pp. 122-124] (Brennan, J., conc. in result) [expressing disagreement as to issues reached and their resolution]; *Curtis Publishing Co.* v. *Butts*, *supra*, 388 U.S. at p. 162 [18 L.Ed.2d at p. 1115] (Warren, C. J., conc. in result) [expressing disagreement as to rationale employed].)

is valid under the California Constitution. Beneath the somewhat orotund language of the opinions they quote, the majority seem to be in accord. Rightly so. It is true that, as a court, we should carefully consider whatever views the Legislature may express on the issue. But we simply are not bound to give them deference. "The Constitution is itself a law, and must be construed" and applied "by some one. Each department" of government— the legislative, executive, and judicial—"must be kept within its appropriate sphere. There must, then, from the very nature of the case, be a power lodged somewhere in the government to construe" and apply "the Constitution in the last resort. The different departments cannot be each left the sole and conclusive judge of its own powers. If such was the case, these departments must always contest and always be in conflict; and this cannot be the case in a constitutional government, practically administered. [¶] The judiciary, from the very nature of its powers and the means given it by the Constitution, must possess the right to construe" and apply "the Constitution in the last resort . . . . It would be idle to make the Constitution the supreme law, and then require the judges to take the oath to support it, and after all that, require the Courts to take" another branch's "construction" or application "as correct." (*Nougues* v. *Douglass* (1857) 7 Cal. 65, 70; accord, *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 354 [276 Cal.Rptr. 326, 801 P.2d 1077].) Thus, in giving the final word on the validity of the provision in question, we cannot be compelled merely to repeat the first, which was the Legislature's assertion to the affirmative. Rather, the final word must be fully our own. And, as my colleagues explain, it must be negative.

I part company with the majority, however, in their conclusion that the decision of the Court of Appeal does not satisfy section 14 of article VI of the California Constitution, which declares that a determination of this sort "shall be in writing with reasons stated." This mandate is essentially a prohibition against summary disposition. The decision here is not in violation.